**In-Cho CHUNG, Plaintiff,**

v.

**Lawrence PARK, Individually and as President of Mansfield State College, et al., Defendants.**

Civ. No. 73–371.

United States District Court, M. D. Pennsylvania.

Jan. 30, 1974.

As Amended Feb. 27, 1974.

Martin M. Fine, Williamsport, Pa., for plaintiff.

Robert Nagel, Mark Widoff, Dept. of Justice, Harrisburg, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

Plaintiff In-Cho Chung brought this civil rights action under 42 U.S.C. § 1983 alleging that the Defendant college officials terminated his employment at Mansfield State College in violation of his constitutional rights. Professor Chung claims that he possessed a contractual right to continuous employment under the College's Tenure Policy which was violated when his employment was terminated without an adequate hearing and that thus, Chung was denied "due process of law" under the 14th Amendment to the federal Constitution. Chung also claimed a deprivation of liberty without due process based upon an asserted restriction on his right to free speech. The free speech claim was eliminated as an issue in this Court's opinion on Defendants' motion to dismiss on September 18, 1973. A three-day trial followed on the sole issue of Plaintiff's right to a due process hearing, leaving for later determination the question of the sufficiency of the due process hearing afforded Plaintiff.

After hearing all the evidence and argument of counsel at trial, and upon consideration of all the files, records and briefs, the Court makes the following findings and conclusions.

### II. Findings of Fact.

1. Mansfield State College is an educational institution funded and operated by the Commonwealth of Pennsylvania. (Pa. Public School Code, 1970, Feb. 17, P.L. ——, No. 13, 24 P.S. § 20–2001 et seq.).

2. Under college regulations and practice, the departmental chairman, the divisional dean, and the academic vice-president recommended to the President and the Board of Trustees grant or denial of tenure and this procedure was known to Plaintiff during his employment at the college. (Tr. Vol. 1, p. 127; Vol. 2, p. 150; Vol. 3, pp. 17, 114, 117, 131; R–1).

3. The President did not uniformly follow the tenure recommendations of the departmental chairman. (Tr. Vol. 3, pp. 175–178).

4. The responsibility for determining the method of teacher evaluation for tenure purposes was left to the departmental chairman and varied from department to department. (Tr. Vol. 3, pp. 118–119; Vol. 2, p. 75).

5. When Plaintiff was hired, he received a copy of the Faculty Manual, containing the College procedure for deciding tenure questions. (Tr. Vol. 1, p. 103).

6. Plaintiff is an adult citizen of the Commonwealth of Pennsylvania, residing in Mansfield, Pennsylvania. (Tr. Vol. 1, p. 97).

7. Defendant Lawrence Park is President of Mansfield State College. (Vol. 3, p. 116).

8. Park is a resident of the Commonwealth of Pennsylvania residing in Mansfield, Pennsylvania. (Tr. Vol. 3, p. 116).

9. Defendant Edward Gassner was at all times pertinent to this case, Chairman of the Biology Department of the Mansfield State College and resided in Wellsboro, Pennsylvania. (Tr. Vol. 3, p. 17).

10. Gassner became chairman of the Department of Biology at Mansfield

State College in July, 1970. (Tr. Vol. 3, p. 16).

11. Defendant Sylvester Schmitz was Vice President for Academic Affairs of Mansfield State College after 1968 and is a·resident of the Commonwealth of Pennsylvania residing in Mansfield, Pennsylvania. (Tr. Vol. 3, pp. 58, 88).

12. Charles Holmes was at all times pertinent to this case, Dean of the Division of Arts and Sciences of Mansfield State College, and resides in Havre, Montana. (Complaint, ¶ 5(c); Answer ¶ 2).

13. On or about January, 1967, Dr. Newelle Schappelle, Chairman of the Biology Department of Mansfield State College until the academic year starting in the fall of 1970, was instructed by the President of Mansfield State College to obtain the services of an instructor of Biology with professorial status; that is, a Doctorate of Biology and at least seven years teaching experience. (Tr. Vol. 2, pp. 45, 46; Vol. 3, p. 16).

14. On or about February, 1967, Plaintiff applied for employment at Mansfield State College, Mansfield, Pennsylvania. At that time Plaintiff held a Doctorate in Plant Biology from the University of Michigan and had eleven years of teaching experience in that subject. (Tr. Vol. 2, pp. 98–102).

15. After travelling to Mansfield State College for numerous interviews, Plaintiff was orally offered a position as Professor of Biology at Mansfield State College by Defendant Sylvester Schmitz, then serving as Dean of the College, and Dr. Newelle Schappelle, Chairman of the Biology Department. (Tr. Vol. 1, pp. 105–107).

16. On April 5, 1967, Plaintiff received written confirmation of this offer from Fred E. Bryn, then President of Mansfield State College. (Complaint, Exhibit #2).

17. On September 1, 1967, after having orally accepted the offer of employment, Plaintiff entered into his duties as a Professor of Biology at Mansfield State College. (Complaint, ¶ 13; Answer ¶ 9).

18. Plaintiff was employed for three academic years between 1967 and 1970 on a year-to-year, probationary status, and he understood his status to be probationary during that period of time. (R–1; R–23, exhibits "A", "B", and "C" of the Complaint, Tr. Vol. 1, pp. 103, 114–116; 133–134).

19. At the time Plaintiff was hired, Defendants indicated that Plaintiff could expect his employment to continue as long as his performance remained satisfactory. (Tr. Vol. 1, pp. 105–108).

20. In the course of his duties as Departmental Chairman, Dr. Schappelle received student complaints about Plaintiff's grading practices and his diction which rendered his lectures incomprehensible. (Tr. Vol. 2, pp. 48–49).

21. Prior to Plaintiff's fourth year of probationary employment, Dr. Schappelle discussed student complaints with Plaintiff (Tr. Vol. 2, pp. 78–82).

22. Prior to Plaintiff's fourth year of probationary employment, Dr. Schappelle informed Plaintiff that if he could not draw students he might not be needed by the college. (Tr. Vol. 2, p. 79).

23. On May 14, 1970, Dr. Schappelle recommended to President Park that Plaintiff's probationary status be extended for two academic years and that formal student evaluations of Plaintiff's teaching effectiveness be obtained. (Tr. Vol. 2, pp. 67, 78, 83; R–9).

24. Prior to Plaintiff Chung's fourth year of probationary employment, Dr. Schmitz discussed with Plaintiff student complaints about his grading practices and classroom presentation and informed him that there was a chance he could secure tenure if he made the necessary improvements. (Tr. Vol. 3, pp. 96–97, 101, 112–114; cf. pp. 107–111).

25. By letter dated January 12, 1970, Defendant Park offered Plaintiff a fourth year of probationary employment and notified Plaintiff of three so-called "concerns" upon which the decision to

extend the probationary period was based. (R–10).

26. Defendant Park expressed the so-called "concerns" to Plaintiff by the letter dated January 12, 1970 in the following language:

"(1) There are reports by some students that they have difficulty understanding your presentation through language barriers.

"(2) There are disappointing enrollments in upper level elective courses you teach. The feeling is that this fact is related to the first concern.

"(3) We expect to have a new Chairman of Biology, and in view of the questions raised above, we feel it is appropriate for the new person to have a role in evaluating your services to the College before a tenure decision is made." (R–10).

27. By letter dated February 11, 1970, Plaintiff attempted to refute the "concerns" expressed by Defendant Park. (R–10; R–23; Tr. Vol. 1, pp. 133–134).

28. By letter of February 11, 1970, Plaintiff accepted the offer of a fourth year of employment. (R–23).

29. On May 23, 1969, Dr. Charles Weed, the acting Chairman of the Biology Department, wrote a derogatory evaluation of Plaintiff's teaching techniques. (R–5).

30. Soon after Plaintiff received Defendant Park's offer of a fourth year of probationary employment, Dr. Holmes, the Dean of the Division of Arts and Sciences, showed Plaintiff a summary of Dr. Weed's negative evaluation. (Tr. Vol. 1, pp. 141–142).

31. Among the criticisms made in the Weed evaluation shown to Plaintiff were criticisms of classroom techniques and of Plaintiff's inability to communicate effectively with students because of a language barrier. (Tr. Vol. 1, p. 145).

32. In October of 1970, during Plaintiff's fourth year of employment, the new departmental Chairman, Defendant Gassner, convened a Departmental Tenure Committee to assist him in preparing recommendations on the questions of tenure for Plaintiff and two other probationary professors. (Tr. Vol. 2, pp. 111, 119, 132; Vol. 3, p. 19).

33. The Departmental Tenure Committee made no efforts to conduct a thorough evaluation of Plaintiff. (Tr. Vol. 2, pp. 125–127).

34. On October 26, 1970, the Departmental Tenure Committee recommended to Defendant Gassner that he recommend that Plaintiff be given tenured status beginning September, 1971. (C–6; Tr. Vol. 2, p. 118).

35. During the fall of 1970, Plaintiff asked Defendant Gassner whether he was going to be recommended for tenure and explained that he was considering purchasing a local drug store. (Tr. Vol. 1, pp. 117–118).

36. Defendant Gassner replied that he could not advise Plaintiff on the purchase of a drug store and that he himself could see no problem in recommending Plaintiff for tenure. (Tr. Vol. 1, pp. 118, 129–131; Vol. 3, pp. 20, 33).

37. After the conversation described in paragraphs 35 and 36, *supra*, Defendant Gassner received student complaints relating, *inter alia*, to Plaintiff's teaching abilities and practices. (Tr. Vol. 2, p. 131; Vol. 3, pp. 21, 45).

38. Defendant Gassner arranged to have the students present their complaints directly to members of the Departmental Tenure Committee in November or early December, 1970. (Tr. Vol. 2, pp. 132, 133).

39. On December 10, 1970, Defendant Gassner recommended to Dr. Holmes that Plaintiff be offered a fifth year of probationary employment. (Tr. Vol. 3, pp. 20, 21, 69, 70; R–48).

40. On January 15, 1971, Defendant Park offered Plaintiff a fifth year of probationary employment, citing the concerns of the new departmental chairman with respect to the quality of Plaintiff's classroom teaching and citing the need

for further evaluation of Plaintiff's teaching effectiveness. (R–15).

41. During the fall of 1970, Defendant Gassner attempted to develop a set of student evaluation forms to be used in evaluating Plaintiff, as well as other non-tenured professors in the department. (Tr. Vol. 3, pp. 19, 22, 47, 48, 56, 57; R–25).

42. On January 5, 1971, Defendant Gassner requested that Plaintiff distribute the evaluation forms to his class on the following Thursday and that the students be instructed to return the forms directly to Defendant Gassner's Office. (Tr. Vol. 3, pp. 25–26; Vol. 1, p. 154).

43. Plaintiff did not distribute the evaluation forms to his students at any time. (Tr. Vol. 1, pp. 166–168; Vol. 3, pp. 26, 28).

44. On January 25, 1971, Plaintiff met with Defendant Gassner and asked: (1) to be recommended for tenure; and (2) whether Gassner still wanted to receive the student evaluation forms. (Tr. Vol. 3, pp. 27, 28).

45. On January 25, 1971, Defendant Gassner reminded Plaintiff: (1) of Defendant Park's decision of January 15, 1971 that Plaintiff should be employed on a fifth year of probation for purposes of further evaluation, and (2) of Defendant Gassner's prior request for a return of the student evaluation forms. (Tr. Vol. 3, pp. 27–28; R–15).

46. On January 29, 1971, Plaintiff again requested that he be recommended for tenure and Defendant Gassner again asked for the student evaluation forms. (Tr. Vol. 3, p. 28).

47. Defendant Gassner never received the student evaluation forms from Plaintiff's students or from Plaintiff. (Tr. Vol. 3, p. 28; Vol. 1, p. 168).

48. By letter dated April 1, 1971, Plaintiff protested the offer of a fifth year of probation and requested that Defendant Park employ "proceedings available to the College Administration for a fair objective determination of whether or not I am entitled to tenure at this time." (C–52).

49. During the fall of Plaintiff's fifth year of employment (1971–1972), Defendant Gassner and Defendant Holmes met to determine a method of evaluating Plaintiff. (Tr. Vol. 3, pp. 30, 31).

50. By September 23, 1971, Plaintiff had refused the Chairman of his Department and his divisional dean entrance to his classes for purposes of evaluating his teaching effectiveness. (R–28; Tr. Vol. 1, pp. 171, 175–177); see also Vol. 2, pp. 16–30).

51. By letter dated September 29, 1971, Plaintiff refused to permit the departmental chairman or divisional dean "any role in the tenure approval." (R–29; Tr. Vol. 2, p. 37).

52. On November 30, 1971, President Park wrote to Dr. Gassner that Gassner's letter withholding recommendation of tenure for Dr. Chung (C–37) was unsatisfactory and Park said: "I am afraid that if it stands we might as well concede tenure." (C–38).

53. Acting on the recommendation of Defendant Gassner and Defendant Schmitz, Defendant Park informed Plaintiff on December 6, 1971, that he would recommend to the Board of Trustees that Plaintiff not receive tenure and cited the following reasons:

"(1) The recommendations of those most knowledgeable about your teaching and your contribution as a member of the department of biology do not support granting you a continuing appointment except under conditions which the administration finds incompatible with the staffing needs of the College and the department.

"(2) There is significant concern among students in your classes about the quality of your teaching.

"(3) Because of the problems with your teaching, the department's ability to assign you to your full share of teaching responsibilities is impaired.

"(4) You did not accept the concerns expressed by the administration about your teaching and you took actions which in effect kept the chairman and your department colleagues from fully identifying and resolving the problems." (R–20; C–37; C–39; C–36).

54. The Board of Trustees approved the President's action in declining to employ Plaintiff for 1972–1973. (Complaint, ¶ 23; Answer, ¶ 9).

55. Plaintiff understood throughout his last two years at the College that his probationary status had been extended in order to evaluate further his teaching. (Tr. Vol. 1, p. 153; R–15; R–10; C–52; Vol. 3, pp. 99, 96–97; Cross reference to paragraphs 27, 28, 39, 40, 41, 42, *supra*).

56. The Tenure Policy of Mansfield State College, as set forth in the Tenure Policy then in effect and applicable to the Plaintiff in § 3 states:

"On appointment, a new faculty member will be informed that after the probationary period of three years or less, if so specified, he may be eligible for continuous employment. Upon accepting a position (unless specified as temporary and/or for less than a period of one academic year) the faculty member shall receive an appointment for one year, which may be renewed for the remainder of the probationary period. Appointments involving less than three years of probationary status must be explicitly noted as to the period of probation in the approval by the Board of Trustees."

57. Section 4 of the Tenure Policy states:

"During the probationary period the President of the College shall inform the faculty member on or before March 15 whether his services will be required for the following academic year, September to May, inclusive. The faculty member shall indicate in writing his acceptance or rejection of the appointment within thirty calendar days."

58. Section 5 of the Tenure Policy states:

"If the college administration does not desire to place a faculty member under continuous employment, the administration shall so notify the faculty member in writing at least by March 15 of the final year of probationary appointment, unless the President of the college sets up specific requirements to be met by the faculty member on a yearly basis, subject to review at the end of each semester. Such continuance of year-to-year employment shall not exceed two years." (Tr. Vol. 1, p. 48).

59. Section 6 of the Tenure Policy states:

"After the expiration of the probationary period of three (3) years a faculty member may have continuous employment subject to the retirement policy of the college."

60. Section 7 of the Tenure Policy states:

"The only valid causes for termination of his services shall be physical or mental disability, insobriety, immorality, when they seriously interfere with the discharge of his duties; incompetency, willful and persistent neglect of duty, or participation in treasonable activities as defined in Article 3, Section 3 of the United States Constitution."

61. President Park's letter to Plaintiff dated January 12, 1970 (¶ 25 above) did not set forth specific requirements to be met by Plaintiff. (Tr. Vol. 3, pp. 151 and 160).

62. Under college practice, the decision to grant tenure was announced by an affirmative letter from the President to the professor. (Tr. Vol. 3, p. 126).

### III. Discussion.

The interest in continuous employment acquired by a teacher working at a state college has been discussed by this Court in Moan v. Oswald, Civil No. 73–290 (M. D.Pa., filed Au gust 23, 1973); and Skehan v. Board of Trustees of

Bloomsburg State College, 353 F.Supp. 542; 358 F.Supp. 430 (M.D.Pa.1973). See also Berry v. Hamblin, 356 F.Supp. 306 (M.D.Pa.1973). These cases follow the principles set forth in the two recent Supreme Court opinions of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (hereinafter referred to as Roth and Sindermann respectively).

A teacher employed by a college or university acting under color of state law has the right to a due process hearing upon dismissal from his position when he has gained tenure or the equivalence of tenure. See Roth and Sindermann, also, Comment, Due Process Rights of Nontenured Teachers—Nonrenewal of Contract, 77 Dick.L.Rev. 94 (1972).

Plaintiff maintains that according to the terms of the Tenure Policy, he obtained tenure after his three-year probationary period at Mansfield State College. The thrust of Defendants' defense is that the Plaintiff did not and could not have obtained tenure because he did not have an "objective expectancy" of continuous employment as he was well aware of his probationary status during his 4th and 5th years at Mansfield State. Hence, two separate inquiries are suggested: did Plaintiff become a tenured faculty member of the College by virtue of the Tenure Policy incorporated into his contract and, if not, did Chung become tenured because he had an "objective expectancy" of continuous employment arising out of the promises of certain College personnel?

Dr. Chung was employed under an informal contract. Dr. Chung's status depends on the interpretation to be given to the Mansfield State College Tenure Policy.

In deciding upon the proper construction of the Tenure Policy, state contract law is appropriate. Roth, 408 U.S. at p. 577, 92 S.Ct. 2701 and the concurring opinion of Chief Justice Burger in Sindermann, 408 U.S. at p. 604, 92 S.Ct. 2694.

Section 6 of the Tenure Policy states that the probationary period for faculty members is three years. Reading Sections 5 and 6 of the Tenure Policy together, Section 5 which I have previously described as a paradigm of turbidity, can be most sensibly interpreted in the following manner: After a three-year probationary period, a faculty member shall either be (1) released from duty, (2) given tenure, or (3) extended on probation for two more years if he be given specific requirements to be met on a yearly basis, subject to review at the end of each semester. Dr. Chung was not released from duty, the first category. He thus had to fall under the second or third categories.

Dr. Chung did not receive "specific requirements" to meet during his fourth and fifth years of probation. The Defendants believe that he should not prevail because:

(1) the "concerns" expressed by the President of the College to Dr. Chung in the College's offer of fourth and fifth year probation to the Plaintiff fulfilled the "specific requirements" section of the Tenure Policy;

(2) the Plaintiff knew or should have known that at no time up to and including his fifth year at Mansfield State did the College intend to grant him tenure;

(3) the College had granted fourth and fifth year probation many times in the past without any faculty member demanding a "due process" hearing; and

(4) the Plaintiff did not cooperate in the evaluation of his teaching ability that could have led to a grant of tenure.

The "concern" related to Dr. Chung in the College's offer of fourth year probation was a "difficulty" some students were having with his "presentation through language barriers." The offer of fifth year probation was even more vague; "the Chairman of the Department has expressed some concerns

about your classroom teaching." The Court had extreme difficulty in understanding Dr. Chung's testimony at trial and recognizes that students must have been highly frustrated indeed during his lectures. However, the question before me is not whether Dr. Chung was a poor teacher but whether he obtained tenure.

"Specific requirements" to be met over a two-year period as prescribed by the tenure policy contemplate a set of goals which a faculty member must meet. The "concerns" expressed to Chung do not qualify as "specific requirements set up by the President." These comments are not adequate to satisfy the language of the Tenure Policy.

■ Dr. Chung never did agree to a fifth year of probation but asserted his contractual right to tenure. The proper remedy would have been for the College to dismiss Chung before the fourth or fifth year or to dismiss him during those years with an appropriate hearing.

■■ The President of the College testified that fourth and fifth year probation had been granted many times in the past and no one had ever demanded a due process hearing. While custom and usage may reflect upon the interpretation of contract language, they cannot be utilized to abrogate the terms of a written contract provision. "A loose, variable custom or discretionary practice does not arise to the dignity of a custom so as to control the rights of the parties to a contract." Shipley et al. v. Pittsburgh and L.E.R. Co., 83 F.Supp. 722, 749 (W.D.Pa.1949). Furthermore, there was no evidence of how similar or dissimilar any of the other fourth-fifth year probation cases were to Dr. Chung's.

■ The college officials argue that they could not evaluate Chung because he refused to permit his superiors to visit his classes. However, the Defendants did not try to develop student evaluations for Dr. Chung and closely to scrutinize his teaching effectiveness until after the beginning of his fourth year at Mansfield State College. By this time it was too late since the aborted evaluation was not tied in to "specific requirements" as contractually mandated.

This case will be set on the March 4 trial list so that I may decide the second issue relating to the adequacy of the hearing afforded Dr. In-Cho Chung.

IV.   Conclusions of Law.

1.   The Court has jurisdiction of this action.

2.   Defendant Board of Trustees is charged by the laws of the Commonwealth of Pennsylvania with the operation and direction of Mansfield State College.

3.   Section 6 of the Pa.Public School Code, 1970, Feb. 17, P.L. ——, No. 13 24 P.S. § 20–2004.1 gives the President of Mansfield State College the power:

"(14)   To establish rules regarding employment rights, promotions, dismissals and tenure of faculty and other employes, subject to the approval of the Board of Trustees and in accordance with broad policies established by the Board of State College and University Directors."

4.   According to the Tenure Policy of Mansfield State College applicable to Dr. Chung, the college was required to provide reasons for termination and a hearing to tenured faculty.

5.   If probation were extended beyond the third year, the college was required to provide the Plaintiff with "specific requirements to be met by the faculty member   . . . ."

■ 6.   The Tenure Policy became part of Plaintiff's contract of employment with the College.

■ 7.   The 14th Amendment to the federal Constitution protects a property interest in continuous employment.

8.   The College did not provide Plaintiff with "specific requirements to be met by" him during the fourth or fifth years of his employment.

9.   Plaintiff's employment status after the third year probation appointment

was that of a tenured professor or employee.

10. It is necessary to decide whether the hearing provided Plaintiff by the College was adequate.

An appropriate order will be entered.