**Dr. Joseph T. SKEHAN, Plaintiff,**

v.

**BOARD OF TRUSTEES OF BLOOMS-BURG STATE COLLEGE et al., Defendants.**

**Civ. A. No. 72-644.**

United States District Court, M. D. Pennsylvania.

May 9, 1973.

As Amended May 14, and May 17, 1973.

Harry Lore, Cohen & Lore, Philadelphia, Pa., of counsel, for plaintiff.

Israel Packel, Atty. Gen., J. Justin Blewitt, Jr., Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants.

## OPINION

MUIR, District Judge.

This suit, brought pursuant to 28 U.S.C. §§ 1343, 2201, 2202, and 42 U.S.C. §§ 1981, 1983 and 1985, alleges deprivations of Plaintiff's constitutional rights in connection with the termination of his employment at Bloomsburg State College in October, 1970. Plaintiff requests damages and injunctive relief, including reinstatement. On January 11 and 12, 1973, a hearing was held to consider Plaintiff's request for a preliminary injunction. This request was denied by the court in an Opinion dated January 31, 1973, D.C., 353 F.Supp. 542, because the nearly two-year delay in instituting this suit indicated that speedy action was not required. The case was placed on the April trial list for a hearing on final injunction and damages. Subsequently, the parties waived a further hearing on the merits and rested on the record developed at the January 11 and 12, 1973 hearing.

Plaintiff Joseph T. Skehan was appointed Associate Professor of Economics at Bloomsburg State College in January, 1969. His contract was renewed for the 1969–1970 and the 1970–1971 school year. At no time did Dr. Skehan have tenure rights to continued employment.

Dr. Skehan did not confine himself to strictly academic duties. He assumed an activist position on many of the issues raised in the campus community, a

position often grating to the administration at Bloomsburg. During the Spring of 1969, Dr. Skehan urged the formation of independent faculty and student organizations. In November and December, 1969, he strongly protested against the dismissal of Professor Deake Porter of the Economics Department, and acted as Porter's academic advisor in the matter. Dr. Skehan was also active in the protest over the firing of Dr. Maxwell Primack, and was appointed to the American Association of University Professor's Committee established to investigate that incident. In April, 1970, Dr. Skehan served as faculty advisor to students at Bloomsburg who expressed their dissatisfaction with the appointment of Defendant Nossen as President of the college.[1]

In addition to the administration's apparent displeasure with Dr. Skehan's extra-curricular activities, there was some criticism of the manner in which he performed his teaching duties. When Dr. Skehan was hired to teach at Bloomsburg in January, 1969, he was given a six-month "trial" contract because he came to Bloomsburg as a result of the non-renewal of his contract at Seton Hall University, the institution by which he was employed from 1965 until the Spring of 1968. Soon after he began teaching at Bloomsburg, Dr. Saini, the Chairman of the Economics Department, discussed with Dr. Skehan the impropriety of absenting himself from Friday afternoon classes by making arrangements with the students to meet at some other time or with other colleagues to take charge of his classes. Also discussed was the difficulty students were having in seeing Dr. Skehan about problems relating to course work. Dr. Skehan assured Dr. Saini that he would adhere to the applicable regulations at Bloomsburg. Despite these assurances, he arranged, without proper approval, to have some other faculty members take

charge of his class during an examination in May, 1969.

Dr. Skehan's contract was renewed for the 1969–1970 academic year. However, as early as February, 1970, he was verbally advised by Dr. Hoch, Vice-President and Dean of Faculties, that his services would no longer be required after May, 1971. This administration position was formalized on May 19, 1970, when Defendant Nossen sent to Dr. Skehan an offer of reappointment for the 1970–1971 academic year with the understanding that 1971 was to be the terminal year of his employment at Bloomsburg. Dr. Skehan did not execute the offer of reappointment, but on May 28, 1970 he sent to Defendant Nossen a letter which stated in part:

"According with provisions on page three of Bloomsburg State College's 'Statement of Policy for Continuous Employment and Academic Freedom' I have re-appointment for the Academic year 1970–71. Your letter confirms the 1970–71 re-appointment. I intend to fulfill the 1970–71 appointment." By letter dated June 1, 1970, Defendant Nossen informed Dr. Skehan that failure to execute the offer of reappointment by June 8, 1970, would be interpreted as a refusal of the offer. Dr. Skehan apparently appealed directly to the Board of Trustees. On June 15, 1970, Defendant Nossen sent to Dr. Skehan a letter which stated in part:

"The College has prepared a contract form which is applicable to all persons offered appointment. Your refusal, to this point, to return the contract in accord with [the Board's] prescribed procedures continues to indicate to [the Board] your disregard for College procedures. Nevertheless, in view of the original intention to provide due notice, [the Board] will accept the alternative letter as an indication of your acceptance of the 1970–1971 appointment as terminal."

---

1. Dr. Skehan also actively protested against United States policy in Vietnam. However, there was no evidence suggesting that his views differed from those of the administration, or that the administration was aware of Dr. Skehan's activities.

On September 18, 1970, Dr. Skehan was sent a standard memorandum advising him that his salary for the 1970–1971 school year was $13,680.00. I find that Dr. Skehan had a contract of employment for the 1970–71 academic year.

The events giving rise to Dr. Skehan's midterm discharge occurred in the Fall of 1970. In February, 1970, the Economics Department met and adopted a proposed schedule of courses to be given in the 1970 Fall semester. Pursuant to this proposed schedule, Dr. Skehan was to teach one advanced course in micro economics, and three principles courses in micro or macro economics. Shortly before August 27, 1970, the College Registrar issued a memorandum to all department chairmen stating that any desired changes in the proposed schedules should be submitted on or before August 27, 1970. No changes were submitted by the Economics Department prior to that deadline. However, on September 12, 1970, three days before classes began, the Economics Department met and approved several proposed schedule changes involving Dr. Skehan and other members of the Department. The request to change the schedule was denied by Vice-President Hoch on September 14, 1970, and the denial was communicated to Dr. Skehan on September 15, 1970. Nevertheless, Dr. Skehan and Professor Porter followed the schedule as changed at the September 12, 1970 Department meeting. Following receipt on September 22, 1970, of a letter from Dr. Hoch directing him to follow the official class schedule, Dr. Skehan began meeting with his classes under the official schedule and with his classes under the requested schedule. Dr. Skehan and Professor Porter both participated in the advanced micro economics course, officially assigned to Dr. Skehan. Professor Porter prepared the course materials and led the classroom procedures.

Pursuant to a request by Dr. Skehan, Vice-President Hoch arranged a meeting on September 29, 1970, to discuss the scheduling problems. At the meeting, attended by the members of the Econom-ics Department and Vice-President Hoch, Dr. Skehan and Professor Porter were given an opportunity to present their views. Vice-President Hoch stated that he denied the requested schedule changes because he felt that the changes were requested for purely personal reasons, and because the changes were not submitted prior to the August 27, 1970 deadline. Other members of the Economics Department, including the acting chairman, Mr. Ross, stated that the Department had sought schedule adjustments and that in light of the Vice-President's veto of the proposed schedule changes, the official schedule should be adhered to. At the conclusion of the meeting, Vice-President Hoch read a statement which provided in part:

"  . . . Dr. Skehan and Mr. Porter are hereby directed to follow the official class schedule, which appears in the Master Class Schedule for the fall semester of the college year 1970–71, beginning Wednesday, September 30, 1970, at 8:00 A.M.

"It is only fair to warn each of you gentlemen that immediate and direct administrative action will follow your failure to teach your classes as scheduled in the official schedule book."

A similar directive and warning was provided to Dr. Skehan in a letter to him from Vice-President Hoch dated September 30, 1970.

On or about October 1, 1970, Dr. Skehan was observed teaching courses not assigned to him under the official schedule. Apparently, Dr. Skehan and Professor Porter utilized a procedure similar to the one employed between September 22, and September 29, whereby both professors participated jointly in the disputed courses. However, it does appear that Dr. Skehan was principally in charge of the Labor Economics course officially assigned to Professor Porter. This was in violation of Vice-President Hoch's directive, in spirit if not in letter. As a result of Dr. Skehan's actions, he was notified by President Nossen by letter dated October 9, 1970, that he was relieved of teaching duties pending a fi-

nal hearing. Dr. Skehan was given five days in which to account for his actions by letter to President Nossen. Dr. Skehan refused to make an accounting, and on October 19, 1970, was removed from the payroll effective October 17, 1970. On October 23, 1970, the Board of Trustees approved Dr. Skehan's dismissal.

On December 1, 1970, the Committee on Academic Affairs conducted a hearing concerning the dismissal of Dr. Skehan. Dr. Skehan appeared only to state that he would not participate in the hearing. On the basis of correspondence and records submitted by the administration, the Committee unanimously approved the dismissal action. Dr. Skehan submitted no material for consideration at the hearing.

■ Plaintiff first alleges that he was discharged from his employment with Bloomsburg State College because of his stands on campus issues which were contrary to the administration's positions, in violation of his First and Fourteenth Amendment rights to free speech. However, the Plaintiff has not shown by a preponderance of the evidence that this allegation is true. On the contrary, I find that the Plaintiff was discharged because of his refusal to follow administrative directives relating to the schedule of classes in the Fall of 1970. He was not discharged for reasons prohibited by the Constitution.

■ Next, Plaintiff contends that he was deprived of his right to procedural due process when he was denied a hearing prior to discharge. The Supreme Court has held that a nontenured professor has a constitutional right to a statement of reasons and a hearing on a university's decision not to renew his contract if he can show that the non-renewal deprives him of an interest in "liberty" or a "property" interest in continued employment. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Likewise, a college professor dismissed during the term of his contract possesses a property interest safe-guarded by due process. Board of Regents v. Roth, *supra*, 408 U.S. at pp. 576–577, 92 S.Ct. 2701. See Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). This is precisely the situation in the case at bar. Therefore, Plaintiff's dismissal during the term of his contract for the 1970–71 academic year at Bloomsburg State College entitled him to a hearing on the reasons for his dismissal.

■ The Defendants contend that Plaintiff was, in fact, afforded a hearing at the September 29, 1970 meeting with Vice-President Hoch. The September 29 meeting was called to discuss the scheduling controversy which ultimately gave rise to Plaintiff's discharge effective October 17, 1970. However, the meeting was concerned with events which transpired prior to September 29. It was Plaintiff's subsequent failure to abide by the directive propounded at the meeting which precipitated his discharge. Although Plaintiff was not constitutionally entitled to reargue his position on the question of which schedule was controlling, he was entitled to a hearing at which he might have attempted to justify his actions after September 30, 1970, or to have presented reasons why dismissal was not the appropriate sanction.

■ The hearing on December 1, 1970 before the Committee on Academic Affairs did not fulfill the constitutional requirements of procedural due process in this case. The hearing was held 1½ months after Plaintiff's discharge. Absent special circumstances, due process requires that one who is deprived of a protected interest be given a hearing prior to the deprivation. Board of Regents v. Roth, supra, 408 U.S. at p. 570, n. 7, 92 S.Ct. 2701; Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center, 356 F.Supp. 500 (E.D.Pa.1973). See Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The case at bar does not represent the kind of extraordinary situation in which the requirement of a prior hearing is relaxed. See Phillips v.

Commissioner, 283 U.S. 589, 597, 51 S. Ct. 608, 75 L.Ed. 1289 (1931); Central Union Trust Co. v. Garvan, 254 U.S. 554, 566, 41 S.Ct. 214, 65 L.Ed. 403 (1921); Citta v. Delaware Valley Hospital, 313 F.Supp. 301, 309–310 (E.D.Pa. 1970).

◼ Having decided that Dr. Skehan was deprived of his constitutional right to a prior hearing, I turn now to the question of appropriate relief. Plaintiff asks for reinstatement with back wages and damages. In my view, reinstatement with back wages would be inappropriate in the case at bar in light of (1) the Court's finding that the Plaintiff was not discharged for exercising his constitutional rights, and (2) Plaintiff's two-year delay in instituting this action.[2] Cases in which courts have ordered reinstatement because of a lack of procedural due process presented situations where either the court found that the Plaintiff was discharged for constitutional impermissible reasons, see e. g. Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center, 356 F.Supp. 500 (E.D.Pa.1973), or where the Plaintiff instituted the action shortly after the constitutional deprivation, see e. g. Karstetter v. Evans, 350 F.Supp. 209 (N.D.Tex.1971); Newcomer v. Coleman, 323 F.Supp. 1363 (D. Conn.1970); Lafferty v. Carter, 310 F. Supp. 465 (W.D.Wis.1970). Furthermore, the recent Supreme Court pronouncements concerning procedural due process in the context of the dismissal of a state employee indicate that reinstatement is not an appropriate remedy. In remanding the case to the lower courts, the Court in Perry v. Sindermann, *supra*, stated that Plaintiff's proof of a property interest would entitle him to a hearing prior to dismissal, but

". . . would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the

grounds for his nonretention and challenge their sufficiency." 408 U.S. at 603, 92 S.Ct. at 2700.

◼ It appears from the above statement in *Perry* that an appropriate remedy would be to order the Defendants to give Dr. Skehan a hearing at this time. Under normal circumstances, I would take such a course. However, this is not the usual case, and there are numerous considerations militating against ordering a hearing to be held 2½ years after Plaintiff's discharge. Most important, I feel that a hearing at this time would be fruitless. I have found that Plaintiff's dismissal was not grounded upon constitutionally impermissible reasons. Therefore, were a hearing to be held at this time, Plaintiff could only attempt to justify his refusal to obey the administrative directive on class scheduling after September 30, 1970. I have heard Plaintiff's testimony on this matter, and I find it highly unlikely that a hearing committee, considering the same evidence, would reverse the administration's decision to discharge the Plaintiff. That decision was eminently reasonable under the circumstances. It has been held that where the Plaintiff was deprived of his right to procedural due process the court should not refer the case back for a due process hearing when such a hearing would not result in altering the action taken against the Plaintiff. Ferguson v. Thomas, 430 F. 2d 852 (5th Cir. 1970). See Stevenson v. Board of Education of Wheeler County, 426 F.2d 1154 (5th Cir. 1970). The following factors have also affected my decision not to order a hearing at this time: (1) Plaintiff's failure to request, in his complaint or elsewhere, that he now be given a hearing by the college on the reasons for his dismissal; (2) Plaintiff's failure to participate in the postdismissal, December 1, 1970 hearing, which from all appearances, would have been a fair and impartial one; and (3) Plaintiff's long delay in instituting this action.

2. Plaintiff was discharged on October 19, 1970, effective October 17, 1970. The complaint was filed October 10, 1972 in the Eastern District of Pennsylvania.

While Plaintiff was deprived of his constitutional right to a hearing prior to dismissal, the deprivation was technical in nature, By such a classification I do not wish to demean a state employee's right to procedural due process. However, the circumstances surrounding this particular case indicate that had Plaintiff been afforded a hearing prior to his discharge, in all probability the outcome would have been the same. Plaintiff's discharge was based upon facts rationally determined and for reasons unrelated to Plaintiff's exercise of constitutional rights. The Plaintiff has not proven any actual damages arising from Defendant's failure to give him a hearing. However, nominal damages are proven by proof of a deprivation of a right to which the Plaintiff is entitled. Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). Therefore, the Clerk will be directed to enter judgment in favor of the Plaintiff for one dollar, together with costs.

An appropriate order will be entered.

This opinion shall constitute the court's findings of fact and conclusions of law under F.R.Civ.P. 52(a).