**Dr. Joseph T. SKEHAN, Appellant,**

v.

**BOARD OF TRUSTEES OF BLOOMS-BURG STATE COLLEGE et al.,**
**Appellees.**

**No. 73–1613.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 25, 1974.

Decided May 3, 1974.

As amended June 11, 1974.

**34**

Michael H. Gottesman, Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., Harry Lore, Philadelphia, Pa., for appellant.

Justin Blewitt, Deputy Atty. Gen., Dept. of Justice of the Commonwealth of Pa., Harrisburg, Pa., for appellees.

Before BIGGS, GIBBONS and GARTH, Circuit Judges

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Plaintiff-appellant, Joseph Skehan, a doctor of economics, seeks redress for his midcontract dismissal without a hearing as a nontenured college professor at Bloomsburg State College. The defendant-appellees are Bloomsburg State College, its Board of Trustees, Dr. Robert Nossen, its President at the time of Skehan's dismissal, Dr. Charles Carlson, its current acting President, and John Pittinger, Superintendent of Education of the Commonwealth of Pennsylvania. Although the College is joined as a defendant, and has a Board of Trustees responsible for its management, Pa. Stat.Ann. tit. 71, § 62, tit. 24, § 20–2008.2, it is not a separately chartered corporation, as in the case of many universities, but a subdivision of the Commonwealth Department of Education, Pa.Stat.Ann. tit. 24, §§ 20–2002(7), 20–2003.1. All the individual defendants are state officers. Skehan was employed as Associate Professor of Economics in January 1969 under a contract extending through the academic year 1969–70. In May of 1970 he received a letter from Nossen offering him a contract for the 1970–71 school year, but indicating that he would be required to acknowledge in writing notice that this would be a terminal year contract. He accepted the offer of employment for the 1970–71 academic year, but protested that the nonrenewal decision had been made without affording him the procedures due him before a nonrenewal decision could be made. In that protest he invoked article 5(e) of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College, which provides:

> "If a faculty member's service to the College is to be terminated during the first two years of the probationary [pretenure] period, the President of the College will feel free to explain to the faculty member the basis of the decision, but he shall not be required to do so except in a situation where there is an allegation of infringement of academic freedom. If a faculty member of professional rank, on probationary employment, alleges that a decision not to reappoint him has been caused by considerations violative of academic freedom, his allegations shall be given preliminary consideration by the Committee on Professional Affairs, and the procedures concerning notification, appeal, hearing, and defense outlined in # 9 of this document will be followed."

Article # 9 outlines the notice, hearing and appeal procedures applicable to the dismissal of tenured faculty members. Thus Skehan's position in May 1970 was that the nonrenewal decision reflected in the terminal year notice was caused by considerations violative of academic freedom and that he was entitled to the

hearing procedures referred to in article 5(e). Nossen replied on June 1, 1970:

"I cannot accept your letter of May 29, 1970 as an acceptance of your position for the coming academic year.

. . .

If you do not sign the offer of reappointment sent you [with the acknowledgment of notice that it was a terminal year contract], you may consider yourself terminated for the coming academic year. . . .

This is my final letter on this matter."

Skehan protested to the Board of Trustees that Nossen was violating the Statement of Policy for Continuous Employment and Academic Freedom. On June 15, 1970 Nossen wrote Skehan:

"Your appeal to the Board of Trustees, bypassing this office and other avenues of College governance, was reviewed at the Board of Trustees meeting on June 12, 1970. The Board has requested that I advise you as follows.

.   .   .   .   .   .

The Board restates its firm and inviolable position of nonrenewal past the 1970–1971 academic year. In doing so, it reaffirms its position that the offer to you reflects simply its wish to conform fully with accepted notice procedures. The offer is neither a statement of confidence in you nor a wish that you remain during this period. On the contrary, the Board has expressed every hope that you will find it both personally and professionally advantageous to offer your resignation at this time.

.   .   .   .   .   .

The College has prepared a contract form which is applicable to all persons offered appointment. Your refusal, to this point, to return the contract in accord with their prescribed proce-

dures continues to indicate to them your disregard for College procedures. Nevertheless, in view of the original intention to provide due notice, they will accept the alternative letter as an indication of your acceptance of the 1970–1971 appointment as terminal.

I must, however, in all honesty and fairness, join with the Board of Trustees in the hope that you will reject the appointment."

Thus the College administration in effect rejected Skehan's request for an article 5(e) hearing on the reasons for the terminal year decision, but rehired him for the academic year 1970–71. Skehan entered into the performance of his academic duties in September. How he performed them is a matter of dispute between him and the defendants.[1] On October 9, 1970 Nossen wrote Skehan:

"You have continued, after repeated warnings from your Chairman, your Dean, the Academic Vice President, and from this office to fail to fulfill your classroom obligations as assigned, according to the procedures in effect at this college. Further, you have flagrantly, wilfully, and maliciously disrupted the instructional program. Upon the recommendation, therefore, of appropriate administrative officers, I am, effective immediately, relieving you of all classroom responsibilities, pending a final hearing.

I hardly need remind you that you are, during this current year, on terminal appointment. You were, at the time that appointment was offered, advised that your previous disruptive activities made your presence on this campus unwelcome, and the hope was expressed that you would not accept. You chose to complete this year, and at the same time you were aware that the offer went well beyond the mini-

---

1. It is common ground that there was a dispute between Skehan and other members of the economics department and the College administration over whether the department or the administration controlled class scheduling. Skehan contends this dispute pro-

vided a subterfuge for his termination because of Nossen's hostility over his previous exercise of first amendment rights. The defendants contend Skehan's intransigence in the scheduling dispute caused intolerable disruption.

mum time necessary for notice, according to the policies of the Trustees; this was done in consideration of the difficulty you would probably have in finding an appointment in mid year. Despite this, you have failed to cooperate, to fulfill your responsibilities as a classroom instructor, and you have made it impossible for others to meet their assigned responsibilities. Your conduct, therefore, has been reprehensible, unbecoming a member of the profession, and inimical to the welfare of this college.

Should you violate the provisions of this notice and attempt to disrupt any authorized lecture or classroom of this college, full and immediate action will be taken. In the interim, I expect to receive from you, within five days, a full and a complete accountability of your actions on this campus since the start of this semester. Your salary will be continued until a final determination is made."

Although this letter demanded from Skehan within five days, "a complete accountability of your actions on this campus since the start of this semester," it was not received by him until October 12, 1970. On October 14 Skehan replied that the suspension had not been preceded by the procedures called for in the College's policy. On October 19, 1970 Nossen wrote Skehan:

"Once again you have willfully and flagrantly failed to respond to my directive: this time an accountability requested on October 9, 1970. You were given five (5) days in which to make your response detailing your professional actions since the start of this semester.

You have failed to comply and I have no alternative but to remove you from the payroll effective October 17, 1970 subject to final approval by the Board of Trustees."

Skehan promptly wrote to the Board requesting a hearing. On October 24, 1970 Nossen wrote Skehan:

"The Board of Trustees, at its regularly scheduled meeting on October 23, 1970, confirmed prior dismissal action taken by this office; you are, therefore, fully and finally terminated at this College effective October 17, 1970."

Skehan went off the College payroll as of October 17, 1970. On December 1, 1970 the Committee on Academic Affairs convened to hold a hearing concerning Skehan's dismissal. He appeared but declined to participate. On the basis of correspondence and records submitted by the administration the Committee approved the dismissal action.

The defendants do not now dispute that Skehan had a contract of employment for the 1970–71 academic year. Skehan contends, but the defendants dispute, that he had a contract right to a hearing, pursuant to article 5(e), with respect to the reasons for the terminal year decision, which had the effect of depriving him of the opportunity for tenured faculty status after three years. The parties agree that the contract for the academic year 1970–71 was such as under Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), gave Skehan a property interest which could not be terminated without a due process hearing. The defendants contend, but Skehan disputes, that the December 1, 1970 meeting satisfied the requirements of Perry v. Sindermann, *supra*. The report of the hearing committee on the December 1, 1970 hearing discloses that it dealt only with the October 17, 1970 dismissal, and not with the May 1970 demand for an article 5(e) hearing on the reasons for the terminal year decision. Finally Skehan contends, but the defendants dispute, that both the terminal year decision and his discharge were motivated by the administration's dislike of his exercise of first amendment rights. Violations of these rights, Skehan contends, entitle him to relief despite the limitation of any property interest in his contract. *See* Perry v.

Sindermann, *supra* at 598; Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

Skehan filed his complaint in the district court in August 1972, seeking preliminary and permanent injunctive relief of reinstatement and backpay, declaratory relief that his dismissal violated the Constitution, punitive damages, and attorneys fees. A preliminary injunction was denied on January 31, 1973. Skehan v. Board of Trustees of Bloomsburg College, 353 F.Supp. 542 (M.D.Pa.1973). Subsequently the parties stipulated that a final hearing could be held on the record developed at the hearing on the preliminary injunction. The district court filed its opinion on May 9, 1973, 358 F.Supp. 430, and a final judgment "that the Plaintiff recover of the Defendants the sum of one dollar ($1.00), together with costs." Timely motions to amend the judgment to award more than nominal damages and to assess counsel fees were denied. This appeal followed.

The District court found:

(1) that Skehan had a contract of employment for the 1970–71 academic year which was a property interest within the meaning of Perry v. Sindermann, *supra*, and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972);

(2) that the December 1, 1970 hearing before the Committee on Academic Affairs, held a month and a half after termination, did not fulfill the constitutional due process requirements for the termination of his property right in the 1970–71 contract;

(3) that Skehan was discharged because of his refusal to follow directives of the administration with respect to scheduling disputes, and not for the prior exercise of his first amendment rights.

The district court made no finding:

(1) as to whether Skehan had a contractual right to an article 5(e)

hearing to determine the reason for the terminal year decision; or

(2) as to whether the terminal year decision was made in retaliation for his exercise of first amendment rights.

In considering the remedy for the due process violation which it found, the district court concluded that it would not be appropriate to order reinstatement and backpay, either to the end of the 1970–71 academic year or to the date of a hearing. The Court reasoned:

"While Plaintiff was deprived of his constitutional right to a hearing prior to dismissal, the deprivation was technical in nature. By such a classification I do not wish to demean a state employee's right to procedural due process. However, the circumstances surrounding this particular case indicate that had Plaintiff been afforded a hearing prior to his discharge, in all probability the outcome would have been the same. Plaintiff's discharge was based upon facts rationally determined and for reasons unrelated to Plaintiff's exercise of constitutional rights. The Plaintiff has not proven any actual damages arising from Defendant's failure to give him a hearing. However, nominal damages are proven by proof of a deprivation of a right to which the Plaintiff is entitled. . . ." 358 F.Supp. at 436.

We reverse and remand for further proceedings.

## I. GOVERNING LEGAL PRINCIPLES

In Board of Regents v. Roth, *supra*, and Perry v. Sindermann, *supra*, the Supreme Court considered the various Constitutional rights which might be affected by the dismissal of a college teacher, and the source of those rights. It recognized a dichotomy between employment rights of property based upon a contract between the institution and the teacher, the source of which is the

state law of contracts, and rights of liberty based upon provisions of the federal constitution such as the first amendment. As to property rights the appropriate analysis is to determine, under applicable state law, the nature and extent of the contract right and, if the contract right has been terminated other than by expiration of its term, to consider whether the method of termination comported with fourteenth amendment procedural due process. If a procedural due process violation has occurred, the court proceeds to fashion a remedy. With rights of liberty, such as the right of a faculty member to be free from disability imposed for engaging in speech protected by the first amendment, the analysis starts with an inquiry into the substantive reasons for whatever action is complained of. If it is found that either termination or nonrenewal was because of the exercise of protected speech (as an example), the procedural due process of the decision is irrelevant because the substantive decision is illegal as a matter of federal constitutional law. If such a substantive violation of a right of liberty has occurred, the court proceeds to fashion a remedy which, depending on the circumstances, may be the same as or different from the remedy for a procedural due process violation in the property context.

## II. THE PROPERTY-PROCEDURAL DUE PROCESS CLAIM

■ As we pointed out above, the defendants do not dispute that Skehan's contract for the academic year 1970–71 gave him such a state law property interest as required procedural due process for termination. They urge, however, that the district court erred in concluding that the December 1, 1970 hearing did not suffice. If we were to accept that position, there would be no occasion to reach Skehan's claim that the district court remedy was inadequate. But there is a substantial difference in the position of the parties once termina-tion has actually occurred. First, the employee, cutoff from the payroll, is greatly disadvantaged in his ability to pursue the hearing remedy. He may be forced by the necessity for survival to seek other employment which will foreclose the pursuit of reinstatement. Second, the institution will have made substitute teaching arrangements, thus introducing into the hearing consideration of the interests of other faculty members. This inevitability will increase whatever tendency may already exist for the hearing officials to defer to the administration's decision. We agree with the district court, therefore, that a hearing after the fact is not the due process equivalent of the pretermination hearing required by Perry v. Sindermann, *supra*. See 358 F.Supp. at 434–435. The termination of Skehan's 1970–71 contract violated procedural due process.

■ Skehan presented another contractual claim upon which the district court made no finding—that under article 5(e) he was entitled to a hearing on the reasons for the decision to make the 1970–71 contract his terminal year. The court did make a finding that the October 17, 1970 termination was not the result of Skehan's earlier constitutionally protected speech.[2] This finding does not dispose of the claim that the terminal year decision was made for reasons prohibited by principles of academic freedom. Within the meaning of the Statement of Policy for Continuous Employment and Academic Freedom, academic freedom may have a meaning broader than, the equivalent of, or narrower than, the protection afforded by the first amendment. That meaning must be determined under Pennsylvania law. It must also be determined whether, as a matter of interpretation, article 5(e) confers a contractual right or is solely a matter of administrative grace, or is a noncontractual administrative procedure designed to avoid the possibility of violation of the first amendment. Certainly for tenured faculty the State-

2. *See* page 39 *infra.*

ment of Policy for Continuous Employment and Academic Freedom of Bloomsburg State College appears to confer contract rights with respect to the hearing procedures outlined in article 9. The cross-reference from article 5(e) to article 9, while ambiguous, could well support a finding that even nontenured faculty members have a contractual right to have the renewal decision made without the taint of considerations violative of academic freedom, whatever that term means. If article 5(e) does grant a contract right, Skehan has been deprived of it since the October 17, 1970 termination took place before any article 5(e) hearing was held, and the December 1, 1970 hearing was not addressed to the article 5(e) issue. In the absence of district court findings on the scope of article 5(e) under Pennsylvania law we must, as did the Supreme Court in Perry v. Sindermann, *supra* at 599–603, remand. If the district court finds that article 5(e) gave Skehan a contractual interest of some kind, an appropriate remedy for its breach must be fashioned.

## III. THE LIBERTY-FIRST AMENDMENT CLAIM

■■ It is clear that nonrenewal of a nontenured public school teacher's one-year contract, or midyear termination of that contract, may not be predicated even in part on his exercise of first amendment rights. Perry v. Sindermann, *supra* at 596–598; Simard v. Board of Education, 473 F.2d 988 (2d Cir. 1973). It is also clear that contract rights aside, the allegation that nonrenewal or midyear termination was based on the teacher's exercise of first amendment rights does not give him a right to a hearing by the institution. Rather, such an allegation of a substantive violation of federal constitutional rights is heard and determined by the court in the first instance. *See* Perry v. Sindermann, *supra* at 599 n. 5; Clark v. Holmes, 474 F.2d 928, 932 n. 4 (7th Cir. 1972), cert. denied, 411 U.S. 972, 93 S. Ct. 2148, 36 L.Ed.2d 695 (1973). The district court found that Skehan had not proven by a preponderance of the evidence his allegation that

"... he was discharged ... because of his stands on campus issues which were contrary to the administration's positions, in violation of his First and Fourteenth Amendment rights to free speech. ... On the contrary, I find that Plaintiff was discharged because of his refusal to follow administrative directives relating to the schedule of classes in the Fall of 1970." 358 F. Supp. at 434.

Skehan contends this finding is clearly erroneous. But while there is ample evidence which would have supported a contrary finding,[3] there is evidence supporting the district court finding.[4] We cannot say that it is clearly erroneous and we cannot substitute our evaluation of the evidence for that of the district court. Thus whatever rights Skehan has with respect to the October 17, 1970 discharge depend upon the termination of his contract without procedural due process.

■ The terminal year decision, however, presents a separate issue. The district court finding that the October 17, 1970 termination was caused by the scheduling incident rather than by Skehan's prior stands on campus issues does not dispose of his claim that the terminal year decision, made several months before the scheduling dispute arose, was similarly motivated. On that issue the district court made no finding. If it were to find that the decision not to re-

3. Skehan points to his activist position on the Vietnam war, the administration's displeasure with his extracurricular activities, the trivial nature of the scheduling dispute, and Nossen's intemperate utterances toward him.

4. The district court points out, for example, that there is no evidence suggesting that his views on Vietnam differed from those of the administration, or that the administration was even aware of the extracurricular activities. 358 Supp. at 432 n. 1. Certainly there was a scheduling dispute.

new his contract was based on stands on campus issues with which the administration disagreed, the nonrenewal decision would be substantively defective under the first amendment and the court would have to fashion an appropriate remedy.

## IV. THE DISTRICT COURT'S REMEDY

The district court rejected Skehan's claim for reinstatement and backpay, and awarded nominal damages for the property-procedural due process violation which it found. Since we have already determined that additional findings are required with respect to the article 5(e) contract claim and the first amendment claim on the terminal year decision, the district court obviously will have to reconsider the remedy problem with respect to those claims. Even with regard to the termination claim, however, the district court's award of nominal damages was improper. The court reasoned that "had Plaintiff been afforded a hearing prior to his discharge, in all probability the outcome would have been the same." 358 F.Supp. at 436. This conclusion was thought to follow from the court's finding on the liberty-first amendment claim, that the termination resulted from the scheduling dispute. But while it was proper for the court to consider that claim in the first instance, it was not proper to substitute the finding it made for the in-house hearing which the institution should have afforded prior to terminating the 1970–71 contract. Such a retrospective substitution of the district court's judgment for that of the administrative hearing officers seriously undermines the hearing requirement. A district court cannot exercise the discretion which is vested in an administrative hearing board, nor can it bring to the dispute the same expert knowledge of the academic environment which should enlighten the deliberations of an academic hearing agency. A board of his academic peers might regard Skehan's scheduling imbroglio as far more trivial than would a district judge. A board of his academic peers might say he is guilty of misconduct, but he should not be fired for that kind of misconduct. The district judge could not exercise such discretion. Furthermore, if we countenance the practice of making findings which the institution should have made, a substantial incentive toward affording procedural due process prior to contract termination will be removed. The result will be to place considerable unreviewable discretion in the hands of the administrators by permitting discriminatory application of the availability of pretermination hearings. Those discriminated against will be forced to the expense, inconvenience and delay of a lawsuit to get what remains of the due process hearing which should have been provided by the state at the administrative level in the first instance. If the due process protection of contract rights mandated by Board of Regents v. Roth, *supra*, and Perry v. Sindermann, *supra*, is to be meaningful, the sanction for deprivation of that protection must be something more than was awarded in this case. *See, e. g.*, Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L. Ed.2d 576 (1964); Silver v. New York Stock Exchange, 373 U.S. 341, 365–366 n. 18, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Vitarelli v. Seaton, 359 U.S. 535, 545–546, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

## V. THE APPROPRIATE REMEDY

Skehan seeks what has sometimes been characterized as the equitable remedy of reinstatement with backpay. The reinstatement remedy has been awarded frequently for terminations unlawful for procedural defects, *see, e. g.*, Vitarelli v. Seaton, *supra*; McNeill v. Butz, 480 F.2d 314 (4th Cir. 1973); Cooley v. Board of Education, 453 F.2d 282 (8th Cir. 1972); Olson v. Regents of University of Minnesota, 301 F.Supp. 1356 (D.Minn. 1969); Lucia v. Duggan, 303 F.Supp. 112 (D.Mass.1969), or substantive de-

fects, *see, e. g.,* Stolberg v. Members of the Board of Trustees, 474 F.2d 485 (2d Cir. 1973) ; Rauls v. Baker County, Georgia, Board of Education, 445 F.2d 825 (5th Cir. 1971). Application of that remedy is complicated in this case by the fact that the 1970–71 contract year had already expired by the time the suit started, by the absence of a finding with respect to the article 5(e) claim which might have extended Skehan's contract rights past June of 1971, and by the absence of a finding on the claim that non-renewal was for reasons prohibited by the first amendment. But assuming no more than the due process violation which the district court found, backpay from October 17, 1970 to the end of the contract year would seem appropriate. Skehan also seeks attorneys fees. We must first determine, however, from which of the defendants these remedies, or any other retrospective remedies the district court may deem appropriate, may be obtained.

### A. *The College*

■■■ Bloomsburg State College is named as a defendant. The Attorney General of the Commonwealth appeared for it and all other defendants, filing a common answer for all. The status of the College in the governmental structure of the Commonwealth is somewhat ambiguous. We noted a similar ambiguity in Braden v. University of Pittsburgh, 477 F.2d 1, 6–7 (3d Cir. 1973) with respect to the status of the University of Pittsburgh, which, like Bloomsburg State College, is a part of the Commonwealth system of higher education. But unlike the University of Pittsburgh, Bloomsburg State College apparently has no separate corporate existence. *Compare* Pa.Stat.Ann. tit. 24, §§ 20–2002(7), 20–2003, 20–2003.1, *with* University of Pittsburgh—Commonwealth Act, Pa. Stat.Ann. tit. 24, §§ 2510–201 to 2510–211. In Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973), decided after our opinion in *Braden,* the Supreme Court of Pennsylvania abolished governmental immunity for local government units—in that case a school board. That holding would seem to apply to separately chartered educational institutions such as the University of Pittsburgh carrying out the governmental function of public higher education. And if under Pennsylvania law Bloomsburg State College is a subsidiary governmental unit, it too, is amenable to suit. Thus there would be no state sovereign immunity problem with respect to backpay award assuming, as we do, subject matter jurisdiction to make such an award.[5] If under Pennsylvania law Bloomsburg State College is in effect merely an agency of the Commonwealth rather than a subsidiary governmental unit, the *Ayala* case does not apply, for in Brown v. Commonwealth of Pennsylvania, 453 Pa. 566, 305 A.2d 868 (1973) the Supreme Court of Pennsylvania made clear that the Commonwealth still claimed immunity. *See also* Pa.Stat.Ann. tit. 17, § 211.401. The district court did not decide into which category Pennsylvania would fit Bloomsburg State College. Assuming that it would fall within *Brown* rather than *Ayala,* Skehan urges that the Commonwealth has, by not pleading sovereign immunity in the district court, waived that defense. It is well established that the defense of sovereign immunity from suit in a federal court may be waived. *E. g.,* Missouri v. Fiske, 290 U.S. 18, 24, 54 S.Ct. 18, 78 L.Ed. 145 (1933). A general appearance in litigation in a federal court may be such a waiver. Clark v. Barnard, 108 U.S. 436, 447–448, 2 S.Ct. 878, 27 L.Ed. 780 (1883). But while the Attorney General did not plead sovereign immunity on behalf of the College in the district court he vigorously asserted it here. In Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed. 2d 662 (1974) the Supreme Court held "that the eleventh amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be

5. *See* page 44 *infra.*

raised in the trial court." That holding would seem to have overruled the Ninth Circuit decision in Lidie v. State of California, 478 F.2d 552 (9th Cir. 1973) upon which Skehan relies, and to have limited the applicability of cases such as Clark v. Barnard, *supra*. See Jordon v. Gilligan, 500 F.2d 701 (6th Cir., 1974), vacating as void under rule 60(b) a judgment awarding attorneys fees against the state. But see Jordan v. Fusari, 496 F.2d 646 (2d Cir., 1974). Edelman v. Jordan, *supra*, also reversed Jordan v. Weaver, 472 F.2d 985 (7th Cir. 1973) which had held that in connection with equitable relief against individual defendants a retroactive monetary award could be made from state funds.[6] Thus if under Pennsylvania law the College is an agent of the Commonwealth, state sovereign immunity would preclude the award of any relief against it directly and any but prospective monetary relief, equitable or legal, in an order directed against the individual defendants. *Edelman,* while not ruling on the matter specifically, appears to bar the award of attorneys fees from the state treasury as well.[7] But if the College is a subsidiary governmental

**6.** The Court approved the Second Circuit's decision in Rothstein v. Wyman, 467 F.2d 226 (2d Cir. 1972), cert. denied, 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315 (1973), [94 S.Ct. 1347], which had been followed in recent decisions of the Fourth and Eighth Circuits, Dawkins v. Craig, 483 F.2d 1191 (4th Cir. 1973) and Like v. Carter, 486 F.2d 552, 554 (8th Cir. 1973), petition for cert. filed sub nom. Burns v. Doe (U.S. Sept. 11, 1973) (No. 73–406). The Court overruled its decisions in Sterrett v. Mothers' and Children's Rights Organization, 409 U.S. 809, 193 S.Ct. 68, 34 L.Ed.2d 70 (1972), aff'g 2 CCH Pov.L.Rptr. ¶ 15,384 (N.D.Ind.1972) (3-judge court); State Dep't of Health and Rehabilitative Services v. Zarate, 407 U.S. 918, 92 S.Ct. 2462, 32 L.Ed.2d 803 (1972), aff'g 347 F.Supp. 1004 (S.D.Fla.1971) (3-judge court); Wyman v. Bowens, 397 U.S. 49, 40 S.Ct. 813, 25 L.Ed.2d 38 (1970), aff'g 304 F.Supp. 717 (S.D.N.Y.1968) (3-judge court) (*see* order at [1968–71 transfer binder] CCH Pov.L.Rptr. ¶ 10,506); and Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), aff'g 270 F.Supp. 331, 338 n. 5 (D.Conn.1967) (3-judge court), to the extent payment of retroactive benefits was ordered in these cases. *See also* note 7 *infra*.

**7.** The contention could be made that, by failing to expressly overrule its summary affirmance in Sims v. Amos, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972), aff'g 336 F.Supp. 924 (M.D.Ala.1972) (3-judge court) of an award of attorneys fees against state officers which was to be satisfied from the state treasury, the Court meant to leave the issue open. *See* Gates v. Collier, 489 F.2d 298 (5th Cir. 1973), following *Sims* and quoting the jurisdictional statement raising the eleventh amendment issue before the Court. Such a conclusion would, however, be inconsistent with the *Edelman* Court's rationale. We attribute the Court's omission to inadvertence. For a listing of other decisions overruled, *see* note 6 *supra*. *See also* Jordon v. Gilligan, *supra*, finding, after *Edelman*, an eleventh amendment bar to the award of attorneys fees. *But cf.* Jordan v. Fusari, *supra*.

Skehan, pointing to language in Justice Marshall's dissent in Edelman v. Jordan, *supra*, contends that the liability of the Commonwealth for retroactive benefits in his case is still open. Justice Marshall wrote:

"It should be noted that there has been no determination in this case that state action is unconstitutional under the Fourteenth Amendment. Thus, the Court necessarily does not decide whether the States' Eleventh Amendment sovereign immunity may have been limited by the later enactment of the Fourteenth Amendment to the extent that such a limitation is necessary to effectuate the purposes of that Amendment, an argument advanced by an *amicus* in this case. In view of my conclusion that any sovereign immunity which may exist has been waived, I also need not reach this issue." 42 U.S.L.W. at 4432 n. 2 [94 S.Ct. at 1371].

An appreciation of this cryptic comment requires some refined analysis of the issues dealt with in Justice Rehnquist's majority opinion. Claims for money against a state can arise in three separate legal frameworks. First, the claim may be based upon state law, purely and simply; breach of contract, for example. Second, it may be based upon federal law made binding upon the states by virtue of the supremacy clause; nonpayment of benefits mandated by the Social Security Act, for example. Third, it may be based upon the fourteenth amendment, which binds the states directly and under § 5 of which Congress has the power to create remedies. *Edelman* involves retroactive welfare benefits withheld in violation of the Social Security Act, and thus falls in the second legal framework. A fourteenth

unit both as a matter of Pennsylvania law under the *Ayala* case and as a matter of the federal law of state sovereign immunity, nonprospective monetary relief is available. *See* Edelman v. Jordan, [94 S.Ct. 1347]. We do not deem it appropriate on this record to make a determination into which category Pennsylvania law places the College, especially since that record was not developed with the benefit of the *Ayala* and *Brown* cases in Pennsylvania and the *Edelman* case in the Supreme Court. On remand the district court should make an appropriate determination. If it concludes that the College is a subsidiary governmental unit, an appropriate decree can include retroactive pay and attorneys fees. The extent of any backpay award will depend upon the court's findings on the article 5(e) and first amendment nonrenewal contentions.

### B. *The Individual Defendants*

■■ The individual defendants are not protected by sovereign immunity. Even if the College is immune, they may be ordered to reinstate Skehan at least until such time as he has been afforded such hearing as the court finds is required. As Edelman v. Jordan makes clear, that relief may include the payment of his salary prospectively out of College funds even though the College itself may be found to enjoy state sovereign immunity. As to backpay and attorneys fees, even if the College is immune there remains the question whether the individual defendants should be held liable. Such a recovery against individual defendants would be in the nature of damages, rather than as a part of the equitable remedy of reinstatement. Such a recovery of damages, as distinguished from reinstatement, must be predicated upon conduct deemed to be tortious under federal law, Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), 42 U.S.C. § 1988, or state law, 42 U.S.C. § 1988. The Attorney General on behalf of the individual defendants pleaded official immunity. We have held that a resolution of that defense requires the development of the facts as to whether the defendants in question are in positions where they exercise such discretionary governmental functions as to entitle them to official immunity. Safeguard Mutual Insurance Co. v. Miller, 472 F.2d 732, 734 (3d Cir. 1973); Lasher v. Shafer, 460 F.2d 343, 348 (3d Cir. 1972); *see* Bauers v. Heisel, 361 F. 2d 581 (3d Cir. 1966), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967). The district court made no findings on whether the individual defendants exercise such discretionary governmental functions, but unlike Scheuer v. Rhodes, 42 U.S.L.W. 4543, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), Safeguard Mutual Insurance Co. v. Miller, *supra* and Lasher v. Shafer, *supra*, the position of each defendant is clear in the record, and the Pennsylvania statutes defining their duties establish that they exercise discretionary governmental functions.[8] Pa.Stat.Ann. tit. 24, § 20–2008.2 (Board of Trustees); Pa.Stat.Ann. tit. 24, §§ 20–2003.1, 20–2003.2, 20–2004 (Secretary of Education); Pa.Stat.Ann. tit. 24, §§ 20–2004, 20–2004.1 (President). Of course, as indicated above, this official immunity from claims for damages and attorneys

---

amendment claim provided a basis for federal jurisdiction, but was not decided. *See* Hagans v. Lavine, 42 U.S.L.W. 4381, 415 U. S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Thus Justice Marshall is technically correct that *Edelman* does not dispose of the third category. But the majority opinion expressly overrules Shapiro v. Thompson, *supra*, State Department of Health and Rehabilitative Services v. Zarate, *supra*, and Wyman v. Bowens, *supra*, all fourteenth amendment cases. We think *Edelman* must be read as closing the door on any money award from a state treasury in any category.

8. The district court did find, as required by *Scheuer*, that the constitutional deprivation was technical in nature and "not the product of bad faith on the part of Defendants." Order of June 12, 1973 (unreported), at 2.

fees does not preclude injunctive relief. Ex parte Young, 209 U.S. 203, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Safeguard Mutual Insurance Co. v. Miller, 472 F.2d at 734–735. Thus, to the extent that the order appealed from denied recovery of backpay and attorneys fees from the individual defendants, we affirm, though for different reasons than relied on by the district court.

### C. *Attorneys Fees*

■ Although it found that a due process violation had taken place and awarded nominal damages, the court refused to award Skehan attorneys fees. Such awards have repeatedly been held to be appropriate in suits seeking redress for improper dismissal. *E. g.,* Stolberg v. Members of the Board of Trustees, 474 F.2d 485 (2d Cir. 1973); Donahue v. Stauton, 471 F.2d 475, 482–483 (7th Cir. 1972), cert. denied, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973); Jinks v. Mays, 350 F.Supp. 1037 (N.D.Ga.1972). *See* Cooper v. Allen, 467 F.2d 836, 840 (5th Cir. 1972). Attorneys fees have also been awarded frequently in civil rights cases not involving dismissals from employment. *E. g.* Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972); Lee v. Southern Homes Sites Corp., 444 F.2d 143 (5th Cir. 1971); N.A.A.C.P. v. Allen, 340 F.Supp. 703 (M.D.Ala.1972); Dyer v. Love, 307 F.Supp. 974 (N.D.Miss.1969). See Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). The district court refused to make such an award because "the constitutional deprivation was technical in nature; it was not the product of bad faith on the part of the Defendants." Order of June 12, 1973 (unreported), at 2. Undoubtedly this conclusion was reinforced by the district court's ruling, which we have reversed, that it could substitute its decision for the due process which the College should have afforded. Withholding an award of attorneys fees in a case where a con-stitutional violation has been established removes a substantial incentive toward efforts looking to vindicate Constitutional rights. It is true, as the district court points out, that Skehan was pursuing an individual, not a class remedy. But the public has an interest in having its state-related institutions act in compliance with the fourteenth amendment. We therefore disapprove the reasons advanced by the district court for rejecting the attorneys fees request.

That does not end the inquiry, however. We have held that the individual defendants are covered by official immunity. If an attorneys fees award is to be made it must be made against the College. Whether such an award can be made against it will, as we pointed out above, depend upon its status.

### VI. JURISDICTION

■ Skehan asserts jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1343(3), (4) and the Civil Rights Acts. The jurisdictional amount requisite to support jurisdiction under § 1331 is pleaded, and the claim for recovery in excess of $10,000 clearly is not frivolous. Jurisdiction over the individual defendants is clear both under § 1331 and under § 1343 and 42 U.S.C. § 1983. Because the requisite jurisdictional amount for § 1331 is pleaded, the fact that the College is not a "person" within the meaning of 42 U.S.C. § 1983 is not significant. Thus we have no occasion in this case to determine whether, in view of the Commonwealth's abandonment of state sovereign immunity with respect to subgovernmental units in the *Ayala* case, those units may be sued in a federal court where, because the claim is less than $10,000, jurisdiction must be predicated on 28 U.S.C. § 1343(3), (4). *But see* 42 U.S.C. § 1988. There is § 1331 jurisdiction to award relief against the College if under Pennsylvania law it is not an agency of the Commonwealth covered by the Commonwealth's immunity.

## VII. CONCLUSION

The judgment of the district court will be vacated and the case will be remanded for findings of fact:

1. as to the governmental status of Bloomsburg State College;

2. as to the nature of the interest created under Pennsylvania law by article 5(e) of the Statement of Policy for Continuous Employment and Academic Freedom at Bloomsburg State College;

3. as to whether the decision not to renew Skehan's contract after 1970–71 was based on stands on campus issues with which the administration disagreed.

Since we have held that the individual defendants are entitled to official immunity, if the court should find that the College is covered by the Commonwealth's state sovereign immunity neither backpay nor attorneys fees could be awarded. If the court should find that the College is within the *Ayala* rather than the *Brown* case an award of backpay should be considered. The extent of such an award will depend upon the court's findings as to the article 5(e) claim and as to the reason for nonrenewal. If Skehan's only contract right expired by its terms at the end of the 1970–71 academic year, and there was no first amendment violation, the backpay award should cover the 1970–71 period only. The claim for reinstatement would then be moot. But if either the article 5(e) claim or the first amendment claim should be decided in Skehan's favor, the court should consider the award of backpay to date if the College is not immune, and also prospective reinstatement, as to which there is no immunity problem, at least until appropriate college procedures have taken place. If the College is not immune the court should also reconsider its ruling on the award of attorneys fees.