**Malthon M. ANAPOL, Plaintiff,**

v.

**The UNIVERSITY OF DELAWARE et al., Defendants.**

**Civ. A. No. 75–414.**

United States District Court, D. Delaware.

Feb. 25, 1976.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

William Poole and James F. Burnett, of Potter, Anderson & Corroon, Wilmington, Del., for defendants.

## OPINION

WALTER K. STAPLETON, District Judge:

Beginning sometime in the late 1960s and continuing through December 31, 1975, Dr. Malthon Anapol was employed by the University of Delaware in the Speech-Communication Department of the College of Arts and Sciences. By the Fall of 1974 he had attained the rank of Associate Professor. At that time he submitted a dossier to the Promotion and Tenure Committee of the Speech-Communications Department in support of an application for promotion to the rank of Full Professor. Included among the publications in Dr. Anapol's dossier was a photocopy of an article written by him for a publication called the *Barrister*. The masthead at the top of the first page of this article contained the heading "Trial Lawyers Association" beneath its title logo.* The application for promotion was not granted.

During the Fall of 1975 Anapol resubmitted his dossier and agreed that, in addition to its being used to evaluate him as a promotion candidate, it could be used as a basis for making the periodic evaluation required of all faculty members. Again included in the dossier was a copy of the *Barrister* article, this one differing slightly from the first in that the volume number and date were missing. Trouble developed when Dr. Borden, the Chairman of the Speech-Communications Department, and Dr. Boyd, a member of the Department's Promotion and Tenure Committee, tried to ascertain the stature of the *Barrister*. While recitation of the details of their detective work could fill several pages,[1] it suffices for present purposes to state that, as an outcome of their investigation, Dr. Borden became convinced that Dr. Anapol had probably deliberately "doctored" the masthead of the *Barrister* article to make the publication appear more prestigious than it really was (the *Barrister* is, in fact, a publication of the Pennsylvania Trial Lawyers' Association), that Dr. Anapol had forged a letter, purportedly from a Philadelphia attorney, praising the *Barrister,* and also that Dr. Anapol had not been candid when questioned in the course of Dr. Borden's and Dr. Boyd's investigation.

A memorandum setting forth and documenting these conclusions was submitted by Dr. Borden to Helen Gouldner, Dean of the College of Arts and Sciences, on December 9, 1975. The ultimate result was that, effective December 31, 1975, Dr. Anapol was terminated for cause, pursuant to a December 17, 1975 letter of Dean Gouldner stating as follows:

> This is to notify you that you are terminated for cause as of December 31, 1975. The cause is the falsification of documents in your promotion dossier. This constitutes gross irresponsibility.[2]

The first inkling Dr. Anapol had of the trouble that was brewing came as a result of a telephone call in which he was asked to meet with Dr. Borden on Sunday evening, December 14, 1975, and was told that it concerned something "serious". At the meeting, not only the allegedly "doctored" article and forged letter, but also a number of other problems perceived by Dr. Borden, were discussed. In the course of the conversation, Dr. Anapol acknowledged forging the letter but denied any other impropriety. At the end of the meeting, Dr. Borden informed Anapol that if Anapol had not resigned by 9:00 A.M. the following morning, he was recommending termination of his employment to Dean Gouldner.

For some period between 9:00 A.M. and 10:00 A.M. the next morning, December 15, 1975, Anapol met with Dean Gouldner at his request.[3] Anapol concedes that Dean Gouldner orally advised him of the charges

---

* Plaintiff's Trial Exhibit [hereinafter PX] 13, Exh. I.

1. The details of the Professors' efforts, along with the documents involved, are contained in PX 13, especially body of report, and Exh. E.

2. PX 17.

3. Anapol got to see the Dean some time after 9:00 A.M., but had an exam to give at 10:00.

being considered against him. It is fair to infer from the record as a whole that the "charges" which were stated were the charges of doctoring the article and of forging the letter.[4] Anapol admitted forging the letter but went on to state surrounding circumstances which he maintained made this aberrant conduct more understandable, if not justifiable. He strenuously denied having doctored the article. Before the close of the conference, Dean Gouldner informed Anapol that he had a choice between resigning or being terminated as of December 31, 1975. In response, Anapol indicated he would consider the matter and asked, in any event, that any termination be deferred until the end of the second semester in June of 1976. Dean Gouldner indicated that she would consider this request. The fair inference from all of the evidence is that Anapol, when he left the December 15, 1975 meeting, was justifiably under the impression that Dean Gouldner's decision to terminate had been made. While they expected to meet or otherwise be in touch again about the matter, this was understood by Anapol to be for the purpose of communicating his decision on resignation and her decision on his extension request.

Anapol and Dean Gouldner met again on the afternoon of Wednesday, December 17, 1975, at her request. Gouldner had already had the termination letter quoted above typed and presented it to Anapol "at some point" during the conference, "possibly at first". While it may be, as she testified, that Dean Gouldner was prepared to listen to any additional facts or circumstances which Anapol desired to relate, it is clear that he had no reason, at least in advance, to believe that such an opportunity would be afforded. Dean Gouldner denied Anapol's request to permit him to teach during the Winterim session and the second semester, but did give Anapol until December 22nd to make a decision about resignation.

On December 22, 1975 Anapol called Gouldner and informed her of his decision not to resign. She told him that he already had his termination letter and that the forms for his termination would be processed. This lawsuit ensued, in which Dr. Anapol's motion for a temporary restraining order was denied on December 29, 1975.[5] The motion for preliminary injunction was merged with the merits of Dr. Anapol's procedural due process claim and the case was tried to the Court on January 23, 1976.

At the risk of stating the obvious, I note that the question now before the Court is *not* whether the forged letter provided grounds to terminate Dr. Anapol's employment at the University. The question which is before the Court is whether the Due Process Clause guaranteed to Dr. Anapol *procedural* safeguards which he was not accorded. Accordingly, I turn to that question.

The defendants do not deny that the actions taken by them with respect to Anapol's termination were taken under color of state law.[6] Moreover, they admit that Anapol was a tenured associate professor, and, as such, was entitled to whatever procedural protections the Due Process Clause affords. What is in dispute, however, is what pre-termination protections, if any, Dr. Anapol was entitled to under the circumstances of this case, and, if some pre-termination process was due, whether the University's handling of the situation between December 9th and the date of Dr. Anapol's termination afforded the required protection. Plaintiff contends, and defendants deny, that plaintiff was entitled to a full

---

4. It is clear that these two charges were the basis of Dean Gouldner's termination decision. In a memorandum of December 9, 1975 to her superior, Dean Campbell, Dean Gouldner referred to both the doctoring and the forgery and, in the termination letter of December 17, 1975, she referred to the falsification of *documents,* in the plural. Moreover, Dean Gouldner

testified at trial that her decision was based on these two charges.

5. Docket No. 9.

6. The answer admits that the University "is supported in part by State funds and is an agency of the State of Delaware in the sense that the State has delegated to it a part of the educational functions of the State."

evidentiary hearing prior to his termination. Alternatively, plaintiff says that, at a minimum, plaintiff should have been given notice of the charges, an opportunity to prepare a response, and an opportunity to present that response to the one empowered to make the termination decision. Defendants assert that the post-termination procedures available to plaintiff under the University's regulations and collective bargaining agreement with the American Association of University Professors fulfill all of the requirements of due process and that pre-termination procedural protections are, accordingly, unnecessary. In addition, defendants claim that, if any process was due prior to termination, Dr. Anapol was afforded it in this instance.

This Court does not write on a clean slate. In *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3rd Cir. 1974),[7] the Third Circuit passed upon the requirements of procedural due process in a similar situation. In that case a professor was terminated during his contract term on the grounds that he had failed to fulfill his "classroom obligations" and had "flagrantly, willfully, and maliciously disrupted the instructional program." He was notified in writing of those charges by the President of the College on October 9, 1970, and given an opportunity to respond in writing within five days. On October 23rd, the Trustees terminated his employment effective October 17th. On December 1, 1970 the Committee on Academic Affairs was convened to hold a hearing concerning the dismissal.

The Court held that the professor was entitled to a pre-termination hearing and that the December 1st, post-termination hearing did not meet the requirements of due process. The court reasoned:

. . . [T]here is a substantial difference in the position of the parties once termination has actually occurred. First, the employee, cut off from the payroll, is greatly disadvantaged in his ability to pursue the hearing remedy. He may be forced by the necessity for survival to seek other employment which will foreclose the pursuit of reinstatement. Second, the institution will have made substitute teaching arrangements, thus introducing into the hearing consideration of the interests of other faculty members. This inevitability will increase whatever tendency may already exist for the hearing officials to defer to the administration's decision. We agree with the district court, therefore, that a hearing after the fact is not the due process equivalent of the pretermination hearing required by *Perry v. Sindermann,* [408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570,] *supra.* See 358 F.Supp. at 434–435. The termination of Skehan's 1970–71 contract violated procedural due process.

■ While the *Skehan* court did not expressly address itself to the question of what type of pre-termination hearing must be made available, the fair inference from the opinion is that more pre-termination procedural safeguards are ordinarily required than were afforded Dr. Anapol in December of last year.[8] Defendants do not

---

**7.** *Skehan* was vacated and remanded by the United States Supreme Court for a reconsideration of the attorneys' fees and immunity issues in the case. 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474, 43 U.S.L.W. 3624 (1975).

**8.** Implicit in the *Skehan* Court's rationale that termination is an event which solidifies positions is the inference that a professor, after notification of the charges against him, must ordinarily be afforded a reasonable opportunity to prepare and fully present his side of the case prior to that event. Thus, *Skehan* would appear to require at a minimum, at the pre-termination stage: (1) clear notice of the charges being considered, (2) a reasonable time interval to marshall facts and evidence, (3) an explana-

tion of the substance of the evidence supporting the charges, and (4) an opportunity to present his side of the case in a manner which will permit the decision maker to weigh both sides. In this case, clear notice of the specific charges being considered was not given to Dr. Anapol until his meeting with Dean Gouldner on December 15th and that necessarily brief conference is the only occasion on which he even arguably had an opportunity to present his side of the case. Moreover, Dean Gouldner concededly did not give him access to the Borden report and the Court is not persuaded from the evidence at trial that the substance of that report was otherwise communicated to Anapol at the December 15th meeting.

contend otherwise. Rather, they assert, for a number of reasons, that the *Skehan* decision is no longer binding on this Court. Defendants' first argument is based upon a Supreme Court case decided after *Skehan, Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), and a Supreme Court case decided shortly before *Skehan* but not expressly considered in the *Skehan* opinion, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In *Arnett* the court upheld against constitutional attack a civil service termination procedure which afforded an evidentiary hearing only after the employee's termination. Three Justices expressed the view that a pre-termination evidentiary hearing was required.[9] Three held that it was not.[10] The remaining three Justices[11] held that the employees involved did not have a property interest which entitled them to procedural due process and, accordingly, did not reach the issue here in dispute. While some courts have drawn an inference that *Arnett* portends some relaxation of, or even elimination of, the requirements of due process at the pre-deprivation stage, on the condition that more elaborate safeguards are thereafter afforded,[12] the Third Circuit expressly refused to so read *Arnett. Mattern v. Weinberger,* 3 Cir., 519 F.2d 150, 160 n.20, 164 n.21 (1975).[13] Accordingly, I cannot say that *Arnett* dilutes the precedential value of *Skehan.*

In *Goss* the Supreme Court held that before a high school student could be suspended for ten days, he ordinarily must be accorded "oral or written notice of the charges against him and, if he denies them,

an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581, 95 S.Ct. at 740, 42 L.Ed.2d at 739. The majority opinion added the *caveat* that "longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. at 584, 95 S.Ct. at 741, 42 L.Ed.2d at 740. The *Goss* case thus dealt with a different factual situation than *Skehan.* More importantly, the legal analysis of the *Goss* majority is entirely consistent with the approach taken by the *Skehan* court. Accordingly, I find nothing in *Goss* to suggest that *Skehan* would not be decided by the Third Circuit today in precisely the same manner as in 1973.

Defendants' remaining arguments against giving *Skehan* controlling effect rest on factual distinctions. They suggest, first, that Dr. Anapol's confession of forgery eliminated the necessity for pre-termination procedural protections and, second, that this was an emergency situation which justified dispensing with such safeguards.

I find defendants' first factual distinction unpersuasive for two reasons. First, it is apparent, as a factual matter, that more went into Dean Gouldner's termination decision than consideration of his forgery confession. Dean Gouldner had before her evidence which strongly suggested that Dr. Anapol had twice previously falsified documents[14] and that the letter was, accordingly, not a case of a one-time slip under pressure. It is understandable that she considered this evidence. Indeed, it would have been difficult not to do so.[15]

---

**9.** Justices Marshall, Douglas and Brennan.

**10.** Justices Powell, Blackmun and White.

**11.** Chief Justice Burger and Justices Rehnquist and Stewart.

**12.** See, *e. g., Bullock v. Mumford,* 166 U.S.App. D.C. 51, 509 F.2d 384, 386–7 (1974); *Barszcz v. Board of Trustees,* 400 F.Supp. 675, 677–8 (N.D.Ill.1975); *Schoonfield v. Mayor,* 399 F.Supp. 1068, 1083–4 (D.Md.1975); *Phillips v. Puryear,* 403 F.Supp. 80 (W.D.Va.1975).

**13.** See also, *Muscare v. Quinn,* 520 F.2d 1212 (7th Cir. 1975).

**14.** I. e., the two prior submissions of copies of the *Barrister* article in 1974 and 1975.

**15.** While it is clear that Dean Gouldner did not at the time focus on the question of whether the forgery alone would warrant termination, her testimony may be read to suggest that she has subsequently considered that issue and concluded that she would have made the same decision in the absence of evidence about the *Barrister* article. It would seriously jeopardize enforcement of the Due Process Clause, however, if courts were permitted to deny relief in cases of this kind based on after-the-fact speculation about what might have been. *Cf. Skehan v. Board of Trustees, supra,* at 40.

Moreover, a majority of the Supreme Court has at least strongly suggested that due process is not designed solely to guard against erroneous determinations of what might be called primary facts. In *Goss,* the majority commented on the situation in which the school disciplinarian has witnessed the conduct forming the basis for the charge and conceded that the informal hearing there required by the Court would "add little to the factfinding function" in such cases. The Court then added: "But things are not always as they seem to be, and the student will at least have the opportunity to characterize his conduct and put it in what he deems the proper context." 419 U.S. at 584, 95 S.Ct. at 741, 42 L.Ed.2d at 740. Thus, even if Dr. Anapol's "confession" had been the sole basis for Dean Gouldner's termination decision, it would seem that he would nevertheless have been entitled a fair opportunity to put it in as favorable a context as he could.

■ Finally, the defendants contend that, unlike *Skehan,* this is one of those extraordinary cases where the employer's interest in immediate termination is so compelling that it must override the employee's interest in procedural safeguards. *Skehan* and the relevant Supreme Court authorities do leave room for dispensing with pre-termination procedures in the extraordinary case, but this case is not one which comes within the guidelines previously established for applying the principle on which defendants rely.

In *Goss,* for example, the court suggests that, in the academic context, the situations which may be characterized as exceptional and warrant summary action are those in which the offending party "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process." 419 U.S. at 582, 95 S.Ct. at 740, 42 L.Ed.2d at 739. Assuming, as the defendants argue, that condoning dishonesty on the part of a professor would have a

demoralizing effect on other members of the faculty and student body, I do not believe that this is the kind of threat of disruption of the academic process which the court in *Goss* had in mind. Moreover, this risk clearly can be dealt with short of terminating a professor's livelihood on the basis of an essentially *ex parte* proceeding. It would seem unlikely that immediate suspension with pay for the relatively brief period necessary to hear an organized presentation of the professor's defense would be construed on campus as an official sanction of dishonesty. *Cf. Arnett v. Kennedy,* 416 U.S. at 194, 94 S.Ct. at 1664, 40 L.Ed.2d at 56 (concurring opinion of Mr. Justice White).

■ It follows from my conclusion that Dr. Anapol was not accorded the pre-termination procedural due process to which he was entitled under *Skehan,* that Dr. Anapol must be reinstated with back pay. Where a tenured professor is deprived of his property interest in continued employment in violation of the Due Process Clause, this would appear to be the appropriate remedy.[16]

This does not mean, of course, that the University cannot hereafter terminate Dr. Anapol's employment based on the events which gave rise to this litigation, provided adequate procedural safeguards are afforded him. Moreover, if such charges are reinstituted against him and processed with reasonable alacrity, the University, if it determines suspension to be in its best interest, need not return Dr. Anapol to the classroom or campus pending final disposition of those charges.

The plaintiff urges that this Court go no further than to hold that he was denied procedural due process at the pre-termination stage and that he is entitled to reinstatement with back pay. Defendants, on the other hand, urge that the Court pass upon not only those issues but also upon the constitutionality of the procedures set forth

---

16. *Morris v. Board of Education,* 401 F.Supp. 188, 212 (D.Del.1975); *King v. Caesar Rodney School District,* 380 F.Supp. 1112 (D.Del.1974). *Skehan v. Board of Trustees, supra,* clearly

suggests that this is likewise the appropriate remedy where, as here, a contract right has been violated, and the term of the contract is unexpired. 501 F.2d at 40–41.

in the University's Collective Bargaining Agreement (the "Agreement") with the American Association of University Professors. While it is apparent from the record that an order simply directing reinstatement may not terminate the controversy between the parties, and while I believe it to be in the interest of all concerned that the controversy be resolved as soon as possible, prudence dictates that the Court decline the defendants' invitation to proceed further.

I reach this conclusion because the issues which I am asked to decide, in a number of instances, lack the necessary concreteness. While the Agreement does outline procedures to be followed in connection with faculty terminations, its description of these procedures lacks the detail necessary to provide an adequate context for judgment and to assure the Court that all of the issues briefed by the parties will in fact be involved if further proceedings in Dr. Anapol's case are held pursuant to the Agreement.

The problem can be illustrated by reference to the controversy between the parties relating to the fact that the ultimate decision on termination may be made by an administrator who did not attend the evidentiary type hearing. At this point, the Court can only speculate on what such an administrator may have available to him and consider in reaching a judgment. By way of further example, there is plaintiff's claim of a right to be represented by counsel at the evidentiary type hearing and his contention that the burden of persuasion cannot constitutionally be placed upon him. Yet the Agreement does not speak to the burden of persuasion and need not be read to exclude counsel.

Thus, I conclude that if there are to be further administrative proceedings, any judicial determination of their constitutional validity must await their implementation in the concrete circumstances of Dr. Anapol's case.[17]

Submit order.

17. In so saying, I do not mean to prejudge the question of the propriety of further injunctive relief if the procedures to be used are further clarified.