Gilbert HAWKINS, Plaintiff,

v.

**BOARD OF PUBLIC EDUCATION IN WILMINGTON, a corporation, Wendell Howell, Daniel Frawley, Benjamin Amos, Morris Bronstein, Allan Goldfeder, Ruth Graham, in their official capacity as members of the Board of Public Education in Wilmington, Jimmie V. Morris, in his official capacity as Director of Personnel, Joseph E. Johnson, in his official capacity as Superintendent of the Wilmington Public Schools, New Castle County School District, Defendants.**

Civ. A. No. 77–446.

United States District Court,
D. Delaware.

March 14, 1979.

Joseph M. Bernstein, of Brown, Shiels & Barros, Wilmington, Del., for plaintiff.

David H. Williams, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. The plaintiff, Gilbert Hawkins, was employed by the

Board of Public Education of Wilmington ("Board of Education"), and held the position of Fireman Custodian at Bayard Middle School ("Bayard School") since 1969. In May of 1977, plaintiff missed ten consecutive days of work. Shortly thereafter, he was discharged from his position by the Board of Education. Plaintiff claims that his termination violated due process. The named defendants are the Board of Education, its six members[1] in their official capacities, Mr. Jimmie Morris, the Director of Personnel, in his official capacity, Dr. Joseph Johnson, the Superintendent of Wilmington Public Schools, in his official capacity, and the New Castle County School District, into which the Board of Education was merged on July 1, 1978. Plaintiff seeks declaratory relief, reinstatement and backpay. This Court has jurisdiction pursuant to 28 U.S.C. § 1343(4). This Opinion constitutes the Court's findings of fact and conclusions of law.

## I. THE BACKGROUND FACTS.

As Fireman Custodian at Bayard School, plaintiff was responsible for maintaining the heating and air conditioning in the school, as well as doing some amount of custodial work. The record shows that for some time prior to May of 1977, plaintiff's job performance had been less than satisfactory in the view of his superiors. For example, on May 21, 1973, plaintiff was warned by the Chief Custodian at Bayard School, William Hackett, that unless he performed his duties more satisfactorily, corrective measures would be taken. (DX-8). In February of 1976, plaintiff was again warned by Hackett, and his work was monitored. (DX-1). In March of 1976, plaintiff's termination was recommended by Herman Holloway, the Supervisor of Custodians for the Board of Education. (DX 2). However, due to procedural deficiencies, plaintiff was not terminated at that time. Instead he was placed on a sixty day probationary period. (DX 3). Plaintiff per-

formed satisfactorily during this probationary period and, in August of 1976, plaintiff was fully reinstated as a Fireman Custodian. (PX-7). Hackett testified that plaintiff was not a competent Fireman in that he did not always keep the boiler room in operating condition.

In addition, during the fall of 1976 and the winter of 1977, plaintiff developed a substantial attendance problem. From October of 1976 to April of 1977, plaintiff had thirteen recorded absences. (PX-3). On all of those occasions, either plaintiff or one of his relatives telephoned Bayard School to report his absence, in accordance with Board of Education procedure. With one exception, whenever plaintiff missed three or more consecutive days of work, he complied with the rule that he bring in a medical certificate upon his return. The one exception, and the only unexcused absence during this period, was one from February 16 to 18, 1977, when plaintiff's nephew did call in to report that his uncle had been detained in Dover. Plaintiff was docked three days pay for that period of absence.

On April 30, 1977, plaintiff visited his physician and was advised that he had a developing ulcer problem and that he should not return to work until he had his doctor's consent. On Monday, May 2, plaintiff called into Bayard School and reported that he was ill. On May 3, his daughter called in for him. On May 4, his nephew called in and reported that plaintiff would not return until Monday, May 9. On May 9, plaintiff did not return to work. There is conflicting evidence as to whether he called in sick that day.[2]

On that day, Hackett prepared two letters. First, he wrote to Holloway, complaining about plaintiff's absences. He recommended that "Gilbert Hawkins (Fireman) be removed from the job as fireman . . . ." (PX-1). He also wrote to plaintiff, notifying him of his recommendation to Holloway. (PX-10). Both of those let-

---

1. Wendell Howell, Daniel Frawley, Benjamin Amos, Morris Bronstein, Allan Goldfeder and Ruth Graham.

2. Plaintiff testified that he did call in. Hackett testified that he did not.

ters are clearly entitled "Recommendation for Demotion". At trial, Hackett also testified that he was only recommending that plaintiff be demoted from Fireman Custodian to Custodian, to free him from his heating and air conditioning responsibilities as Fireman. Also on May 9, 1979, David Moyer, the Principal at Bayard School, wrote to Holloway asking that "appropriate action" be taken. (PX–2).

On May 11, 1977, Holloway wrote to Jimmie Morris, the Director of Personnel for the Board of Education, advising him that he was recommending a five day suspension of plaintiff because of his absenteeism and poor performance. Holloway stated that he intended to advise plaintiff that one more default would result in a recommendation of termination. (PX–4). There is no indication that a copy of that letter was sent to plaintiff.

Plaintiff was also absent from work from May 10 to 13, 1977. The evidence is not clear on whether he called in to Bayard School on any of those days. On Monday, May 16, 1977, plaintiff returned to work. He brought with him a medical certificate explaining his ten day absence. In accordance with Holloway's May 11 memo (PX–4), Hackett told plaintiff to go see Holloway. When plaintiff went to Holloway's office, Holloway was not there. However, a member of his staff took a copy of plaintiff's medical certificate and then told plaintiff that he was suspended for five days without pay, from May 16 to 20, 1977 (DX–4).

On May 18, 1977, Holloway wrote to Morris, stating that plaintiff had a high rate of absenteeism and noting that, on occasion, plaintiff would return to work with a doctor's slip substantiating his illness. Holloway requested that the "Personnel office inquire of his attending physician justification for long and frequent periods of absence on the part of Mr. Hawkins . ." (PX–5). Morris did not follow up on Holloway's request and did not report back to Holloway about it.

At this point, it is helpful to review the procedure used to terminate a Board of Education employee in 1977. While there was no formal written procedure, there were certain practices which were followed. Initially, complaints were made to the Supervisor of the category of employee involved, in this case, to Holloway, the Supervisor of Custodians. If the Supervisor concluded that the situation warranted termination, he made the appropriate recommendation to the Director of Personnel, Morris. Morris would hold a hearing, and based upon the evidence, if he felt that termination was appropriate, he would make that recommendation to the Superintendent of Wilmington Public Schools, Dr. Joseph Johnson. Based upon Morris' report, Dr. Johnson would make a recommendation to the members of the Board of Education. If requested to do so by the employee, the Board of Education would hold a second hearing. Based upon Dr. Johnson's recommendation or its hearing, the Board of Education would make a decision. Only the Board of Education had the authority to terminate one of its employees.

The events which occurred on Monday, May 23, 1977, are not clear from the evidence, principally because the persons involved in those events have different recollections of what happened. One can piece together from the evidence the following sequence of events, however. On Sunday, May 22, 1977, Holloway telephoned the plaintiff and told him to be at Morris' office for a meeting at 10:00 A.M. on May 23.[3] Although the plaintiff was not told the purpose for that meeting, he was told to bring his Bayard School keys with him. The plaintiff testified that while Holloway did not tell him so, he felt he was going to be terminated because of the instructions regarding his keys.

Prior to 10:00 A.M. on May 23, 1977, plaintiff met with Holloway. After that meeting, Holloway wrote a memo to Morris, stating the following:

---

**3.** While the record is not clear on when the call was made, the parties agree that it was some time on Sunday, May 22, 1977. Docket Item 28, Defendants' Letter Memorandum of January 10, 1979, p. 3. Docket Item 31, Plaintiff's Answer Memorandum, p. 3.

After carefully reviewing the extremely high rate of absenteeism on the record of Mr. Gilbert Hawkins, in addition to his very poor performance of his important Fireman duties. I recommend his termination. On record are a number of infractions on Hawkins part during his entire service with the Wilmington Public School system. He does not respond with consistency to counciling and repeated warnings to improve. Therefore, the above recommendation is considered both fair and appropriate.

(PX–6). There is no indication that a copy of that memo was received by the plaintiff.

Immediately after that meeting, plaintiff and Holloway went to Morris' office. At that time Morris stated that there were charges of poor performance and excessive absences against the plaintiff, and reviewed plaintiff's personnel file with him. At that meeting, plaintiff gave Morris the medical certificate for the ten days of work he had recently missed. While plaintiff claimed that he had turned in medical certificates after other absences as well, Morris did not have those certificates in the file. Plaintiff also denied that his performance had been poor, and claimed that somebody must have been out to get him, since it was the second year in succession in which he had been threatened with termination. The meeting lasted between thirty-five and forty-five minutes.

At the end of the meeting, Morris informed the plaintiff that he would recommend termination. In a letter to the plaintiff on the same date, he stated:

Upon the recommendation of your immediate superiors I am recommending to the superintendent that your services be terminated effective June 17, 1977. The reasons being poor performance and excessive absenteeism.

You have been given due process with conferences with the Principal, your Chief Custodian, and the Supervisor of Custodians. While in conference in my office on Monday, May 23, 1977, you were advised of your rights.

You are being paid for 18 vacation days . . . You may wish to come into the Personnel Office to exercise any termination rights you are entitled to.

(DX–4).

After the May 23, 1977 meeting, the plaintiff approached Roland Small, the President of his Union. On the following day, May 24, plaintiff and Small met with Holloway and Morris.[4] At that meeting, the charges against the plaintiff and Morris' recommendation were rehashed. Morris stated that the plaintiff was going to be terminated. At that time, plaintiff was informed of his opportunity to file a grievance regarding his termination, under the terms of the Union's Collective Bargaining Agreement. (DX–6). He was also told that if he grieved, he probably would not be successful. He declined to do so.

On June 3, 1977, Morris wrote to Dr. Johnson and recommended that plaintiff be terminated effective June 17, 1977 "for poor performance and excessive absences." (PX–8). On June 13, 1977, Morris sent Dr. Johnson an additional memo outlining the "reasons" for the recommended termination. (PX–9). Those "reasons" were: (1) twenty days of "absences without excuse" since October of 1976,[5] (2) the five day suspension, (3) the Holloway recommendation, and (4) the evidence presented at the May 23, 1977 meeting. There was no description or summary of the "evidence presented on May 23". Plaintiff did not receive copies of Morris' memos of June 3 or June 13.

Dr. Johnson recommended to the Board of Education that plaintiff be terminated. He testified as to his reasons for that recommendation. They were: (1) everyone below him in the chain of command recommended that plaintiff be terminated, (2) Morris had reviewed both sides of the evidence, and (3) he assumed that everything

---

4. Initially, the meeting was between plaintiff, Holloway and Small. Morris later joined them at Small's request.

5. These included the days beginning on May 2, 1977.

contained in Morris' June 13, 1977 memo (PX–9) was correct. He also testified that neither he nor the Board of Education had any statements from the plaintiff before them, and that he did not notify the plaintiff of an opportunity for a hearing before the Board of Education.

On June 20, 1977, the Board of Education met and terminated the plaintiff's employment effective June 17, 1977. On June 27, 1977, plaintiff was notified by Morris that the Board of Education had terminated him for poor performance and excessive absenteeism. (DX–5).

Other relevant facts will be discussed throughout the course of this Opinion.

## II. THE ISSUES.

The parties contest virtually every issue in this action.[6] Briefly stated, those issues are: (1) whether the plaintiff had a protected property interest in his continued employment by the Board of Education, (2) if so, whether the termination of that employment was violative of the Due Process Clause of the Fourteenth Amendment, and (3) if so, what relief plaintiff is entitled to. I turn now to the resolution of those issues.

## III. THE PLAINTIFF'S PROPERTY INTEREST.

■ "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The plaintiff does not contend that he had any liberty interest in his continued employment by the Board of Education. He does argue that he possessed a property interest in that employment.

6. The defendants do not deny that their actions with respect to plaintiff's termination were taken under color of state law for purposes of 42 U.S.C. § 1983. The defendants also have not plead, offered testimony in support of, or argued any immunities, should they be found to be liable. Since the individual defendants are

In *McKnight v. SEPTA*, 583 F.2d 1229, 1239–40 (3d Cir. 1978), the court stated:

> As the Supreme Court has written with regard to "property" interests in general, to have such an interest one must have "more than a unilateral expectation" or "an abstract need or desire" for it. Rather, one must have "a legitimate claim of entitlement to it." Such claims are "created and their dimensions defined by existing rules or understandings that stem from an independent source *such as state law*—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709 (emphasis added); *see also Bishop v. Wood*, 426 U.S. 341, at 344 & n. 7, 96 S.Ct. 2074, at 2709, 48 L.Ed.2d 684.

*See also Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If the plaintiff had a "legally enforceable expectation that [he] would continue in the employ of the [Board of Education] absent some action on [his] part which represented cause for [his] dismissal," he "has a protected property interest which entitled [him] to the protections of the Due Process Clause upon [his] dismissal." *Hickey v. New Castle County*, 428 F.Supp. 606, 609 (D.Del. 1977). *See also Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Aiello v. City of Wilmington*, 426 F.Supp. 1272 (D.Del.1976); *Hayes v. City of Wilmington*, 451 F.Supp. 696 (D.Del.1978).

■ The defendants argue that plaintiff has not demonstrated the existence of a property interest in his continued employment because he has "offered no testimony reflecting an expectation that he would not be terminated except for just cause."[7] Given the pleadings in this case, the position asserted by the defendants appears to

sued in their official capacities only, the doctrine of official immunity is not applicable. *D'Iorio v. County of Delaware*, 592 F.2d 681, p. 690, n. 14 (3d Cir. 1978).

7. Docket Item 28, Defendants' Letter Memorandum of January 10, 1979, p. 2.

be a bit disingenuous. Paragraph five of the plaintiff's complaint[8] begins:

> Upon information and belief, it is the practice, custom and usage of the Board [of Education] not to terminate employees in positions such as plaintiff except for good cause shown.

In their answer,[9] the defendants admitted that that allegation was true.[10] Having admitted that their practice was not to terminate employees such as the plaintiff without good cause, the defendants are hardly in a position to argue that the plaintiff has not demonstrated any legitimate expectation that he would not be terminated except for good cause.[11] Under the prevailing law, as set forth in the cases cited above, I conclude that the plaintiff did have a property interest in his continued employment which was sufficient to invoke the protections of the Due Process Clause.

## IV. WAS THE PLAINTIFF AFFORDED DUE PROCESS?

Having determined that the plaintiff did have a property interest in his continued employment with the Board of Education, it is necessary to decide whether his termination from that employment comported with the requirements of due process. I conclude that it did not.

The defendants maintain that plaintiff was given a hearing which met due process standards, as well as two additional opportunities to be heard. First, they argue that plaintiff received due process at the meeting with Morris and Holloway on May 23, 1977. Second, they contend that plaintiff was given an opportunity for a second administrative hearing on June 20, 1977, before the Board of Education, and that he waived that opportunity. Finally, they argue that plaintiff could have grieved the termination decision under his Union's Collective Bargaining Agreement (DX–6), and that his failure to do so was a waiver of his right to a hearing provided under that Agreement.[12]

In order to determine whether the various opportunities for the plaintiff to be heard met the requirements of due process, it is first necessary to define those requirements. In *Anapol v. University of Delaware,* 412 F.Supp. 675 (D.Del.1976), I discussed those requirements in an employee termination context, based upon the decision of the Third Circuit in *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3d Cir. 1974), *vacated and remanded on other grounds,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), *on remand,* 538 F.2d 53 (3d Cir. 1976) (en banc), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976), *on appeal from remand,* 590 F.2d 470 (3d Cir. 1978). I stated at 412 F.Supp. at 678, n. 8:

> Thus, Skehan would appear to require . . . . (1) clear notice of the charges being considered, (2) a reasonable time interval to marshal facts and evidence, (3) an explanation of the substance of the evidence supporting the charges, and (4) an opportunity to present [plaintiff's] side of the case in a manner which will permit the decision maker to weigh both sides.

*See also Goldberg v. Kelly,* 397 U.S. 254, 267–8, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Friendly, *"Some Kind of Hearing",* 123 U.Pa.L.Rev. 1267 (1975). It is against that standard that the various opportunities to be heard which were afforded the plaintiff must be measured.

---

8. Docket Item 1.

9. Docket Item 5, Paragraph 5.

10. It is not necessary that the pleadings of a case be introduced into evidence in order for the Court to consider them. *See* McCormick, *Evidence* (2d ed. 1972), § 265.

11. In addition, as described above, the record reveals that there was an elaborate procedure set up for terminating employees such as the plaintiff, whereby several supervisory levels had to determine whether the situation warranted termination. There would be no reason for such a procedure if the practice were to terminate employees without regard to good cause.

12. Defendants tacitly acknowledge that the May 24, 1977 meeting was not for the purpose of allowing plaintiff to tell his side of the story.

## A. The May 23 Meeting.

 There were a number of deficiencies in the May 23, 1977 meeting, as a result of which that meeting did not afford the plaintiff due process. First, the plaintiff was not provided with advance notice of the charges being considered against him. Second, he was not given a reasonable period of time in which to prepare his side of the case. Third, the plaintiff's side of the case was not communicated to the Board of Education, the decision-making body.

The first two deficiencies may be considered together. As Judge Friendly has stated:

> It is . . . fundamental that notice be given and that it be timely and clearly inform the individual of the proposed action and the grounds for it. Otherwise the individual likely would be unable to marshal evidence and prepare his case so as to benefit from any hearing that was provided. (footnotes omitted)

Friendly, *supra,* at 1280–1. In this case, I am convinced that plaintiff had no notice of the charges against him and no opportunity to prepare his case prior to the May 23 meeting. Accordingly, that meeting did not meet the due process standard.

It is undisputed that plaintiff received no notice of the subject matter of the May 23 meeting, written or unwritten, prior to the meeting. On May 22, 1977, Holloway telephoned the plaintiff and told him only to be at Morris' office for a 10:00 A.M. meeting on May 23, and to bring his Bayard School keys with him. It is true that plaintiff knew, prior to May 23, 1977, that questions had been raised regarding both his job performance and his absences. Plaintiff also testified that he believed, from the time of Holloway's telephone call, that he was going to be terminated on May 23. However, it does not follow that plaintiff had either "clear notice of the charges being con-

sidered," or "a reasonable time interval to marshal facts and evidence." [13] First, plaintiff's knowledge of his impending dismissal could not reasonably serve as notice of what charges would be considered against him at the May 23 meeting. Second, even if plaintiff had known what charges were going to be raised against him, the time interval between the phone call on Sunday, March 22, 1977 and the meeting at 10:00 the following morning did not provide him with any opportunity to marshal his facts and evidence.[14] Therefore, the May 23 meeting did not provide him with a meaningful opportunity to be heard. As will be discussed hereafter, the lack of an opportunity to prepare his side of the case may have had quite a significant effect on the outcome of the termination proceedings.

 In addition, Morris was not the decision-maker in this case. As he stressed during his testimony, his sole function was to make a recommendation to Superintendent Johnson, and only the Board of Education had the authority to terminate its employees. As I noted in *Anapol, supra,* at 678, n. 8, due process requires that the plaintiff have an opportunity to present his side of the case "in a manner which will permit the *decision maker* to weigh both sides." (emphasis supplied). While the Board of Education could properly delegate its duty to provide plaintiff with an opportunity to be heard to its Director of Personnel, that delegation did not relieve the Board of Education of the responsibility of considering the information presented at that hearing.

 At least since *Morgan v. United States,* 298 U.S. 468, 480–1, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) it has been clear that, if due process is to be afforded, the "one who decides must hear". As the Supreme Court

---

13. In *In re Gault,* 387 U.S. 1, 34, n. 54, 87 S.Ct. 1428, 1447, n. 54, 18 L.Ed.2d 527 (1967), the Supreme Court stated that the appellant's " 'knowledge' of the charge . . . does not excuse the lack of adequate notice."

14. There may be situations where one day is sufficient time to marshal one's facts and evidence. However, it is clear that a Sunday phone call regarding a 10:00 A.M. Monday meeting did not afford plaintiff an opportunity to secure documents which were relevant to his case.

pointed out in *Morgan,* the right to a hearing is meaningless if the information there provided by the parties as the basis for decision never reaches the eyes or ears of the decision-maker. This, of course, does not mean that the decision-maker must personally hear the parties. Such a requirement for administrative decision-making would be unfeasible. An administrator or Board may retain the decision-making authority [15] and validly delegate to subordinates the responsibility of holding a hearing, analyzing the evidence, and making recommendations. *Morgan, supra,* at 481–2, 56 S.Ct. 906; *Megill v. Board of Regents of the State of Florida,* 541 F.2d 1073 (5th Cir. 1976); *KFC National Management Corp. v. National Labor Relations Board,* 497 F.2d 298 (2d Cir. 1974); *Norris & Hirshberg, Inc. v. Securities and Exchange Commission,* 82 U.S.App.D.C. 32, 163 F.2d 689 (1947), *cert. denied,* 333 U.S. 867, 68 S.Ct. 788, 92 L.Ed. 1145 (1948). But, nevertheless, there must be some assurance that the information tendered was before the decision-maker in some form prior to the decision. As the court put it in *Southern Garment Mfrs. Ass'n. v. Fleming,* 74 App.D.C. 228, 232, 122 F.2d 622, 626 (1941):

> While "the one who decides must hear", it must be remembered that "hear" is used in the artistic sense of requiring certain procedural minima to insure an informed judgment by the one who has the responsibility of making the final decision and order.

There is no occasion in this case to determine the minimum degree and manner of disclosure to the decision-maker which due process requires since there is no evidence which suggests that plaintiff's positions before Mr. Morris at the May 23 meeting were communicated to the Board of Education in any fashion, summary or otherwise. In short, there appears to have been no effort to comply with the requirement that the "one who decides must hear". This may well have been the result of an assumption by the Board of Education that employees

were advised that they could come directly before the Board if they had information they wished to convey to it. This assumption was not a valid one, however.

Because the plaintiff was not given clear notice of the charges to be considered at the May 23 meeting, or a reasonable period of time in which to prepare his side of the case for that meeting, and because the information he presented at the meeting was not passed on to the Board of Education, the May 23, 1977 meeting did not satisfy the requirements of due process.

### B. The June 20 Board of Education Meeting.

■ The defendants' next contention is that the plaintiff had an opportunity to be heard by the Board of Education on June 20, 1977, and that plaintiff waived that opportunity by his failure to avail himself of that procedure. In *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), the Supreme Court stated:

> For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale,* 1 Wall. 223, 233, 17 L.Ed. 531.

While the record shows that the plaintiff could have been heard by the Board of Education on June 20, 1977, I find that he was never given any effective notice that such an opportunity was available to him. It follows that the June 20 Board of Education meeting did not provide the plaintiff with due process.

There is a conflict in the testimony as to exactly what Morris told the plaintiff on May 23, 1977. Morris testified that at the conclusion of the May 23 meeting, he told the plaintiff that he could be heard by the Board of Education on June 20, 1977. The plaintiff testified that he was merely told that he could take Morris' recommendation "higher". The documentary evidence and

---

**15.** If the applicable law permits, the administrator or Board may, of course, delegate the authority to make the decision, in which event nothing further is required of it by due process.

other testimony supports the plaintiff's recollection of what actually transpired on May 23.

■ Immediately following the May 23 meeting, Morris sent plaintiff a letter. (DX–4). That letter did not mention the opportunity to be heard before the Board of Education on June 20 or at any other time. It is undisputed that there was no other written notice of an opportunity for a Board of Education hearing from either Morris or from the Board itself at any other time. Moreover, Morris' May 23 letter contains other information supporting the plaintiff's position. First, Morris stated that the recommended termination would be effective June 17, 1977. I cannot understand why Morris would have told plaintiff both that his termination would be effective June 17 and that he could have a hearing on the termination on June 20.[16] The May 23 letter also informed the plaintiff that he would receive pay for eighteen vacation days and that he should go to the Personnel Office if he wished to exercise his termination rights.[17] The clear import of Morris' letter is that his decision would be final.

On May 24, 1977, plaintiff and Roland Small, his Union President, met with Morris and Holloway. According to Small's testimony, Morris clearly told plaintiff that he was going to be terminated. As noted above, Small discussed the possibility of filing a grievance with plaintiff. There would be no reason for such a discussion unless the impression was that a final decision to terminate had been made. Small also testified that Morris did not mention the opportunity for a Board of Education hearing at the May 24 meeting. In addition, Holloway, who was present at the May 23 and 24 meetings, did not corroborate Morris' testimony about the June 20 hearing.

Finally, the record shows that the Board of Education had no written termination procedure from which plaintiff could have known of the opportunity for such a hearing. From all of the evidence, I am persuaded that plaintiff never received any notice of an opportunity to be heard by the Board of Education. Accordingly, the June 20, 1977 Board of Education meeting, at which plaintiff was finally dismissed, did not satisfy due process.

C. The Union Grievance Procedure.

■ On May 24, 1977, plaintiff was advised that he could grieve the termination decision,[18] but was also told that his chances for success were slim. He decided not to file a grievance. Defendants contend that by that decision, plaintiff waived his right to be heard.[19] However, I do not believe that the Union's Collective Bargaining Agreement (DX–6) provided the type of hearing contemplated by due process.

In cases of this type, under *Skehan, Anapol, Hickey,* and *Knotts, supra,* due process requires a pre-termination hearing.[20] In *Skehan,* the court reasoned:

16. Although Morris recommended an effective termination date of June 17, 1977, if the eighteen vacation days are subtracted from that date, his termination was in fact effective May 23. Using either of those dates, if he had been given a Board of Education hearing on June 20, 1977, it would have been a post-termination hearing, which would not comport with due process. *See Skehan, Anapol, Hickey, supra*; and *Knotts v. Bewick,* 467 F.Supp. 931 (D.Del. March 14, 1979). *But see DiLuigi v. Kafkalas,* 584 F.2d 22, 27, n. 7 (3d Cir. 1978) (dictum).

17. Plaintiff did exercise those rights on May 23, 1977. (DX–7).

18. While the Collective Bargaining Agreement does not specifically provide that termination decisions may be grieved, Dr. Johnson testified that the grievance procedure could be used for that purpose. The plaintiff does not disagree.

19. Plaintiff correctly points out that exhaustion of administrative remedies is not a prerequisite to suing under Section 1983, citing *United States ex rel. Ricketts v. Lightcap,* 567 F.2d 1226 (3d Cir. 1977). However, that response misconstrues defendants' position. They do not argue that plaintiff has not exhausted his remedies, but rather that he waived his right to a hearing, as provided under the Collective Bargaining Agreement.

20. *But see DiLuigi v. Kafkalas,* 584 F.2d 22, 27, n. 7 (3d Cir. 1978) (dictum).

[T]here is a substantial difference in the position of the parties once termination has actually occurred. First, the employee, cutoff from the payroll, is greatly disadvantaged in his ability to pursue the hearing remedy. He may be forced by the necessity of survival to seek other employment which will foreclose the pursuit of reinstatement. Second, the institution will have made substitute [employment] arrangements, thus introducing into the hearing consideration of the interests of other [employees]. This inevitability will increase whatever tendency may already exist for the hearing officials to defer to the administration's decision. We agree with the district court, therefore, that a hearing after the fact is not the due process equivalent of the pretermination hearing required by *Perry v. Sindermann,* supra.

501 F.2d at 38.[21] The grievance procedure provided in the Collective Bargaining Agreement was obviously unavailable until after the termination. In this case, as noted above, the effective date of plaintiff's termination was June 17, 1977. Yet, the final decision by the Board of Education was not made until June 20, 1977. Had he decided to grieve that termination decision, plaintiff would have been required to file a written grievance with his principal within ten days.[22] The principal would have been required to hold a conference within five working days and render a decision within three more working days. If plaintiff were dissatisfied with that decision, he could appeal to the Director of Plant Operations within three working days.[23] The Director could have been required to hold a conference within three working days, and render a decision within three more working days. If no satisfactory solution were reached at Level Two, the plaintiff could request a hearing with the Superintendent of Schools within three working days.[24] The Superintendent would have been required to hold a hearing within five working days thereafter. It is obvious that that hearing would not have taken place until long after the termination. Such a hearing would not, therefore, have met due process standards.

### D. Summary.

█ I conclude that plaintiff was not given any opportunity to be heard which comported with due process in connection with his termination from employment by the Board of Education. The question remains, however, which defendants deprived plaintiff of due process. The Fourteenth Amendment provides that a person may not be "deprive[d] . . . of . . . property, without due process of law." As discussed above, only the Board of Education, and, therefore, its six members, had the authority to deprive plaintiff of his property, i. e. his continued employment. It follows that only those defendants denied the plaintiff due process of law.

### V. THE APPROPRIATE REMEDY.

As relief, plaintiff seeks a declaration that his termination was in violation of due process, reinstatement and backpay. The defendants contend that since they have proven that they "would have decided to terminate the plaintiff even if [they] had provided a trial-type hearing, plaintiff is limited to an award of nominal damages."[25] In support of that contention, they rely on *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Mount Healthy City School District Board of Education v. Doyle,*

---

**21.** While the *Skehan* case was decided before *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the *Skehan* analysis followed that in *Mathews* and I perceive no reason why the opinion in the latter case would cause the *Skehan* court to change the above-quoted views. *Hickey v. New Castle County; Knotts v. Bewick,* supra.

**22.** This was Level One of the grievance procedure.

**23.** This was Level Two of the grievance procedure.

**24.** This was Level Three of the grievance procedure.

**25.** Docket Item 23, Defendants' Letter Memorandum of January 10, 1979, p. 6.

429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); and *Waters v. City of Wilmington,* C.A. No. 78–259 (D.Del. June 27, 1978), aff'd., 591 F.2d 1338 (3d Cir. 1979). In *Waters,* at p. 6, Chief Judge Latchum stated:

> Merely establishing a technical violation of his procedural due process rights, however, does not entitle plaintiff to the extraordinary remedy of reinstatement. Rather, it shifts the burden to the defendants to prove that they would have decided to terminate the plaintiff's employment even if they had afforded him a trial-type pre-terminating hearing.

*See also D'Iorio v. County of Delaware,* 592 F.2d 681, p. 690, n. 16 (3d Cir. 1978); [26] *Knotts v. Bewick, supra.*

As this case demonstrates, it is no mean task to attempt to predict what a public body would have decided about continuing a person's employment if the procedure employed had been fairly calculated to acquaint the members of that body with the relevant facts. I read the Supreme Court opinions in the *Carey* and *Mount Healthy* cases, and the Third Circuit opinion in *D'Iorio,* however, to mandate that this task be undertaken.

While no member of the Board of Education testified at trial, Superintendent Johnson's testimony was that the Board voted to terminate plaintiff's employment, as one might expect, on the basis of his recommendation. Dr. Johnson's recommendation had, in turn, been based on his belief that everybody below him in the chain of command favored termination, and his acceptance of the facts stated in Morris' June 13 memo. (PX–9). If Dr. Johnson had presented his understanding to the Board at a hearing

called upon reasonable notice, however, plaintiff would have had substantial rebuttal ammunition.

While the June 13 memo recited that Mr. Morris' recommendation was based upon both poor performance and absenteeism, the only facts cited in support of the recommendation related to the plaintiff's record of absences from his job. The picture was a rather dramatic one, one which would compel even the most lenient administrator to act decisively. It was reported that all twenty of plaintiff's absences between October 1976 and May 10, 1977 had been "without excuse." In response, plaintiff would have been able to testify, as he did at trial, that almost all of his absences were occasioned by physical problems of sufficient substance that he had consulted a physician or a dentist and that he had delivered a medical certificate to his supervisor whenever his absence was of sufficient length to require it under the Board of Education's sick leave policy. In corroboration of his own testimony, it appears that plaintiff would have been able to tender Bayard School records showing that all but three of the twenty days were accepted as excused absences for pay purposes.[27] Most importantly, plaintiff would have been able to offer the testimony of his immediate superior, Mr. Hackett, who testified at trial that plaintiff did bring him medical certificates, that he did not believe plaintiff was feigning illness, and that he was never prepared to recommend the termination of plaintiff's employment. What Hackett would have recommended at the hearing, as he did to Mr. Holloway (PX–1) and at trial, was that plaintiff be relieved of his Fireman's duties but that he be retained as a Custodian.

**26.** In *D'Iorio,* the Third Circuit reviewed *Carey v. Piphus,* and said:

> The court in a footnote disapproved certain Court of Appeals cases which allowed the award of back pay to employees discharged in violation of their due process rights even though no reinstatement was ordered because additional proceedings would simply have resulted in their discharge . . . Thus, even if it were determined in this case that only the County Council was authorized to discharge D'Iorio, D'Iorio's claim to back

> pay would appear to be undermined seriously by proof that the County Council would have discharged him using proper procedures.

**27.** Under the Collective Bargaining Agreement, each employee was entitled to twelve sick days per year on an accumulating basis up to a maximum of 120 days. PX–3 suggests that seventeen of the twenty days of plaintiff's absence were accepted as qualified sick days for which he was paid.

It is true that there had been problems with plaintiff's performance unrelated to his absenteeism, and that Mr. Holloway, who initially considered a five day suspension an appropriate disposition of the matter, ultimately concluded on March 23, 1977 that he should recommend termination.[28] In view of Mr. Holloway's strong skepticism about plaintiff's medical excuses, however, one wonders whether he would have made the same recommendation if he had had the opportunity of hearing plaintiff's immediate supervisor testify that he believed those excuses to be genuine. Indeed, Mr. Holloway testified at trial that it would "affect his decision" if there were reasons for the absences.

■ It is also true that the Board might have reviewed plaintiff's overall performance record and concluded that it warranted termination even without reference to his attendance problem. But this is only a possibility and does not satisfy defendants' burden of proof. On this record I cannot find it more likely than not that a fair procedure would have resulted in termination. On the other hand, given the testimony concerning the consequences of a Fireman's deficient performance of his duties and the view of plaintiff's immediate superior that his primary problem was an inability to work confidently with the heating and air conditioning equipment at Bayard School, I do find it more likely than not that a fair proceeding would have resulted in the implementation of Mr. Hackett's original recommendation of demotion. Accordingly, I conclude that plaintiff is entitled to reinstatement and backpay [29] but that both the injunction and damage award should be based upon the assumption that he would be serving as a Custodian if his right to due process had not been infringed.

■ The Board of Education was "the governing body . . . responsible for the operation of the public schools in Wilmington." [30] After *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 2036, 56 L.Ed.2d 611 (1978), the Board of Education "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief . . ." It follows that the members of the Board, in their official capacities, are in a similar position. As the Supreme Court stated in *Monell,* at 690, n. 55, 98 S.Ct. at 2036 n. 55:

> Since official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis—our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

It is also clear that the defendants here are not protected from a backpay award by the Eleventh Amendment. *Monell, supra,* at 690, n. 54, 98 S.Ct. 2018; *Edelman v. Jordan,* 415 U.S. 651, 667, n. 12, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Mahone v. Waddle,* 464 F.2d 1018, 1031, n. 27 (3d Cir. 1977).

■ With regard to backpay, the parties have stipulated to what the plaintiff's annual salary as Fireman Custodian would have been since June 1, 1977.[31] While there is no testimony revealing what plaintiff's salary would have been if he had been demoted to Custodian effective June 17, 1977, it is possible to determine that amount from the salary schedule contained in the Collective Bargaining Agreement. (DX–6). From that schedule, it appears that Custodians were paid approximately

---

28. Mr. Holloway does not currently recall why he decided not to give plaintiff another chance at the Fireman Custodian job, as had been contemplated in the suspension action. (PX–4).

29. *See, e. g., Skehan, supra,* at 40; *Anapol, supra,* at 680.

30. Docket Item 1, Complaint, Paragraph 3. The defendants have admitted that allegation in paragraph 3 of their answer, Docket Item 5.

31. That salary was $10,378.00.

$774 per year less than Firemen Custodians at plaintiff's scale.[32] Thus, plaintiff's annual rate of pay as a Custodian would have been approximately $9,604. Plaintiff was paid by the Board of Education until June 17, 1977, and trial commenced on December 18, 1978. Therefore, plaintiff was off of the Board of Education payroll for exactly eighteen months prior to trial. His lost backpay for that period amounts to $14,406. It is also stipulated that during that period plaintiff received unemployment compensation of $6,424.25. In addition, he earned $1,560 during the three months immediately prior to trial.[33] When the amount of backpay lost is reduced by those amounts, plaintiff is entitled to receive $6,421.75, the amount of uncompensated backpay which he lost, from the Board of Education and its members.[34]

## VI. CONCLUSION.

"[T]he essential reason for the requirement of a prior hearing is to prevent unfair and mistaken deprivations of property . . ." *Fuentes v. Shevin, supra,* 407 U.S. at 97, 92 S.Ct. at 2002. The events which are the subject of this case amply demonstrate the need for a fair hearing before a person is deprived of property. Plaintiff was denied the opportunity for such a hearing. Judgment will be entered in his favor.

Submit order.

---

**32.** For example, a Fireman Custodian with four years of experience would be paid $10,394 on the 1978 schedule, while a Custodian with the same experience would be paid $9,620. (DX–6).

**33.** Plaintiff testified that he had been working forty hours per week at $3/hour for three months.

**34.** Since the members of the Board of Education are sued in their official capacity only, the backpay award, as a practical matter, "must come out of the public treasury of the Board of Education," or its successor. *Monell v. Department of Social Services,* 532 F.2d 259, 265 (2d Cir. 1976), *reversed on other grounds,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).